HAWKHURST S. S. CO. v. KEYSER et al.

(District Court, N. D. Florida. July 3, 1897.)

1. CHARTER PARTY—DEMURRAGE—STRIKES.

Where the lay days of a vessel being loaded by respondent merchants are fixed, but exceptions from the running thereof include the term "strikes," merchants should not be held liable for demurrage, even though the alleged strike was brought about by the demands of the merchants that the laborers engaged in loading the vessel should conform to certain rules and regulations which are perfectly reasonable in themselves.

2. SAME.

Notwithstanding the fact that the charterers acquiesced in certain customs of baymen while loading their ships for some time previous to a strike, this is not a waiver of their right to insist upon their abandonment of such customs if the same are unreasonable, nor is it evidence of their justness.

This was a libel in personam to recover demurrage under a charter party.

Convers & Kirlin, Liddon & Eagan, and B. C. Tunison, for libelant. John C. Avery, for respondents.

SWAYNE, District Judge. This is an action in personam, on the admiralty side of this court, to enforce the payment of demurrage, and arose out of almost the same circumstances as, and the allegations in libel and answer are similar to, those in the case of Wood v. Keyser (decided at this term of court) 84 Fed. 688. However, this case presents some additional facts, and an additional phase of the strike question to that decided in that case. The answer, among other allegations, sets forth certain methods insisted upon by the labor organizations, which had, as members, all the available timber workers in Pensacola Bay, where the ship was being loaded. The allegations in the answer, which, from the record, I must take as fairly representing the facts, so far as this matter is concerned, set up the following:

"The said labor organizations had for years arbitrarily dictated to the timber merchants at Pensacola not only the matter of wages, but also as to the manner of loading vessels at said port with timber, by means of rules and regulations and practices insisted upon, the effect of which was to require the members to work only in a certain way, which deprived their employers

of the full and reasonable work which they could and would perform but for such rules and regulations. That such rules and regulations prohibited what is called 'skull dragging,' which is pushing sticks of timber, over rollers or skulls, into position by hand, after being placed in the port of a vessel; such prohibition causing a loss of time, and the employment of extra men to move the timber, by attaching a dog and chain, and drawing it into place by means of winches and winchmen. That such rules and regulations required that a steamship should be loaded as two ships; the compartments forward of the smokestack being taken as one ship, and the compartments aft of the smokestack being taken as another, and not permitting men to be changed from one to the other, so that in many instances the cost of stowing a small quantity of timber would be greater than its value. That the said rules and regulations of the said associations also required that no matter how small a quantity of timber remained to be placed in the ship after the usual hours completing the last full day's work, as permitted by the associations, the ship should wait until the following day to finish loading, and then that a half gang of men should be employed, and paid for a full day, though but one hour's time might be required for the work. That the said rules and regulations also forbade the use of steam in any manner, and under any circumstances, in the loading of the ship, although steamships were provided with all the facilities for such purposes, and could thereby be loaded more expeditiously, and notwithstanding that the master and owners of the said ships were ready and anxious to supply ships with such facilities without charge, as is customary at all ports except Pensacola. That the practice of the said associations was to stop all work of loading ships in the bay whenever a member of one of the associations died. That the said merchants, including respondents, with but one or two exceptions, decided and notified the said associations that they would not submit longer to the unjust rules and regulations and practices aforesaid of the said associations in regard to the loading of timber of ships," etc.

Under these circumstances the charterers undertook to supply what may be called reasonable terms of employment, under which timber stowers were to be employed in vessels chartered by respondents. Among these terms insisted upon were: (1) That the death and funeral of a member of the associations should not cause a cessation of the work upon the vessels; (2) that skull dragging, or the placing of timber in position in the hold of a vessel by pushing same by hand over skulls or wooden rollers, should be regarded as proper to be insisted upon by said merchants; (3) that gangs of men might be required to work in any part of the ship, either in fore or aft hatches, interchangeably; (4) that charterers should have privilege to employ members to work overtime at one dollar per hour, in order to complete loading, when only small quantity left over on last day; (5) merchants to have privilege of using steam power of vessel, paying wages of same number of men, whether actually employed in loading or not. The record nowhere discloses any allegation or inference that these conditions were unreasonable or unjust to the workingmen, but, on the contrary, from their terms, they appear just and reasonable towards all concerned; and, although the respondents may have acquiesced for some time in these usages, yet this is not evidence of their justness, or a waiver of their right to insist upon their abandonment. If the customs in controversy are unreasonable, the demands of the merchants at that time for their abandonment would, in my opinion, be exactly analogous to a demand on the part of the baymen or stowers of timber that the said customs, supposing the

same had not theretofore existed, should be observed in the future, and the merchants, deeming them unreasonable, refused to comply with said demands. A strike, occurring under these circumstances, being a refusal of a combination of all available workmen to work upon terms which must be viewed by this court as reasonable, seems to fall within the meaning of the strike clause or exception as clearly as where it results from a demand of an advance of wages. If the merchants must submit to the unjust rules and regulations of the labor associations to-day, when, and in the loading of what ships, will it be right for them to take a stand? Beach on the Modern Law of Contracts, at section 238, vol. 1, says:

"Where a 'strike clause' is inserted in a contract, excepting liability in case of failure to perform, occasioned by a strike, the contractor is not thereby prohibited from conducting his business upon the same general principles which would have governed him had the clause not been inserted; nor is he required to resort to extraordinary or unusual means to prevent strikes, but he has the right to adopt such rules and regulations and pay such wages as are reasonable under the circumstances."

In speaking of the strike clause in the contract before it, the court of appeals of New York (Railway Co. v. Bowns, 58 N. Y. 574) says that the additional agreement, that "every effort will be made by the company for the fulfillment of the contract," will not be interpreted as requiring the performance at all events, if within the power of the company; and then, passing to the "strike clause" proper, that court says:

"The strike was immediately preceded, and proximately caused, by a reduction of the wages by the employer: and the contention of the defendant is that as the strike resulted from the voluntary act of the plaintiff, and would not have occurred but for that act, the plaintiff cannot have the benefit of that exception and exemption from liability. But parties may agree in advance under what circumstances and upon what contingencies the contract shall terminate, or either party be absolved from its obligations: and if the circumstances occur or the contingency happens, even by the voluntary act of the party claiming the exemption and the benefit of the stipulation, it will be available to him in the absence of fraud or mala fides." Again, that court says, "Provision was intended to be made against the result of the strikes, but not against their occurrence," and then goes on to define a "strike," within the meaning of the excepted clause: "A strike is a combination among laborers—those employed by others—to compel an increase in wages, a change in the hours of labor, some change in the mode and manner of conducting business, to enforce some particular policy in the character or number of men employed, or the like." "They can always be prevented or arrested, whatever be their origin, by a yielding on the part of the employers to the demands of the combination: and if such were the duty of the plaintiff, under the stipulation to make every effort that the contract with the defendant might be performed, the clause providing for an indemnity from the consequences of a strike was nugatory, and had no meaning. There could be no strike for which the plaintiff would not be responsible, in a way to deprive it of the benefit of the exemption from liability." Again: "The plaintiff acted in good faith in fixing wages of its employés, and upon just and reasonable business principles, and it is in no respect liable to the defendant for the result."

These principles apply with equal force to the case under consideration. The respondents, in insisting upon the change in custom,

did so from what apparently seems to be sound business principles, in good faith, and with a view to place their business and that of the port upon an equal footing with that of other ports; and the refusal of the association and combination to yield cannot be attributable to them, and clearly falls within the meaning and intent of the exception on account of strikes. Other days for which exemption is claimed are classed with those for which a decree was directed to be entered in the case of Wood v. Keyser, heretofore decided; and for days lost, over the stipulated lay days, for these reasons, a decree may be entered in this cause.