## ACTIESELSKABET BARFOD v. HILTON & DODGE LUMBER CO.

(District Court, S. D. Georgia, E. D. July 13, 1903.)

1. SHIPPING—LIABILITY OF CHARTERER FOR DEMURRAGE—DELAY DUE TO STRIKE.

A charter party required the charterer to dock and load the vessel, and do the harbor towage and the towage to sea, and specified the lay days for loading. It mutually excepted "the act of God, * * * strikes, combinations or any extraordinary occurrence beyond the control of either party, * * * dangers and accidents of the seas, rivers and navigation," and also contained a specific clause that "in the computation of the days allowed for delivering the cargo to the ship at port of loading shall be excluded any time lost by reason of strikes." On arrival at the port of loading a strike was in progress among the longshoremen and stevedore's men, and many vessels were waiting to load, making it impossible to load for a number of days, and delaying the work after it was commenced. *Held*, the delay beyond the time allowed for loading being entirely attributable to the strike, that the charterer was not liable for demurrage on that account, but that for a delay in towing the vessel out to sea, after the weather was such as to permit, it was liable for demurrage.

---

¶ 1. Demurrage, see notes to Randall v. Sprague. 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

In Admiralty. Suit against charterer for demurrage.

Walter G. Charlton, for libelant.
William Garrard and Peter W. Meldrim, for respondent.

SPEER, District Judge. The libel of the Actieselskabet Barfod, a Norwegian maritime corporation, is brought to recover a claim for damages in the nature of demurrage against the Hilton & Dodge Lumber Company, a corporation of this district.

It appears from the charter party in evidence that the bark Barfod was chartered by the respondent for a voyage in ballast to Sapelo, Ga., and thence with a cargo of pitch pine timber, etc. From the charter party it also appears that the respondent was under contract to dock and load the vessel at the port of Sapelo, to do the harbor towage, and the towage to sea. It was further stipulated that the shipper should give the charterer written notice three clear working days before cargo was required. Twenty-one weather working days were to be allowed in which to deliver cargo to the ship, and if through any fault of the respondent the ship was longer detained demurrage was fixed at the rate of £14, or $70, for each day of such detention. It is charged in the libel that the bark was delayed contrary to the terms of the charter party for 37 days, and that thereby the libelant became entitled to demand from the respondent demurrage in the sum of $2,590, and for this sum a decree is sought.

Respondent by its answer admits the detention and delay, but defends the claim for demurrage upon the ground that it was ascribable to a general strike among the longshoremen, stevedore's men, and laborers working in the port of Sapelo. The respondent specially sets out the terms of the charter party which it is claimed avoid liability for delays thus occasioned. This contract, as usual, imposes a liability upon the respondent for demurrage, but contains the explicit exceptions following:

"The act of God, restraints of princes and rulers, the queen's enemies, fire, floods, frost, droughts, strikes, combinations, or any extraordinary occurrence beyond control of either party, and all and every other dangers and accidents of the seas, rivers and navigation of what nature and kind soever, during the said voyage, always mutually excepted."

It appears from the evidence that the bark Barfod arrived at Sapelo on the 7th, and was entered at the custom house on the 9th of July, 1900. It is indisputable that at this time there was a general strike in progress among the longshoremen, stevedore's men, and laborers engaged in loading vessels at that port. This strike was directed by an organization termed the "American Federation of Labor," and had been active since the 23d day of the previous month. A large number of vessels were in port at that time, some at the docks of respondent and other merchants on Julington river, others at the ballast grounds, and still others lying at anchor in the roads awaiting their turn to discharge ballast and proceed to the loading wharves. It was with great difficulty that any work could be conducted. Laborers insufficient in number, and wholly inexperienced, had been brought in by the stevedores from neighboring points and from Savannah.

These were terrorized by the striking laborers.    Although kept under heavy guard at Julington, the hostility toward them was so great that they were attacked by the strikers and several of them were wounded. A large number of them quit work, and returned to Savannah. These conditions continued until practically all the shipping was out of the port, and this was not until October, 1900.

With these conditions prevailing at the Julington docks the bark Barfod from July 7th to the 24th lay at anchor in the sound about five miles distant.    At the latter date she was berthed at No. 3 dock of the respondent, taking the place of the "Telefone," which had been transferred to St. Simons, a neighboring port.    It is evident that the Barfod was placed in this berth in her turn, and in view of all the facts, as soon as practicable.

By the terms of the charter, the charterer was entitled to notice three clear working days before it was required to deliver cargo.    The requisite notice was given on July 29th, but ballast was not completely removed and the ship ready for cargo until 6 p. m., July 30th. This appears from the testimony of the master.    Since notice given at this hour would have reached the charterer on the following day, lay days for the delivery of cargo would have begun August 4th, and on that day one-third of the cargo was actually delivered to the bark. The stowing, however, did not begin until August 10th.    On August 30th all of the cargo had been delivered alongside, and on September 3d all had been stowed.    Excluding Sundays, the 11th and 13th, which were stormy, and a legal holiday, the cargo was delivered and stowed within 23 weather working days.    Since by the terms of the charter it must have been stowed in 21 days there were only 2 days of delay in this respect.    This also is plainly ascribable to the strike.    Indeed, the master testified, "I suppose the vessel was loaded as rapidly as the stevedore could considering the delay in lack of men and cutting and trimming timber;" and the stevedore testifies that this "cutting and trimming" is necessary with all cargoes of lumber.

The bark cleared on September 5th.    On the 10th she was dropped down into the sound by the tug Passport, and on the 13th was carried across the bar and to sea by the tug Iris.    The strike did not involve the tugboats, and the delay in getting to sea is ascribed by the respondent to the prevalence of stormy weather.

There can be no doubt that most of the delay experienced by the Barfod was ascribable to the strike.    In addition to the passage from the charter party already quoted, by which it is plain it was agreed that a strike would avoid damages for detention occasioned thereby, paragraph 6 provides:  "In the computation of the days allowed for delivering the cargo to the ship at port of loading shall be excluded any time lost by reason of strikes."    Since the charterer was under obligation not only to deliver the cargo which at Sapelo is done afloat and alongside by means of rafts guided by towboats, but to stow it also, delivery, in the sense of the charter party, must be construed to import delivery stowed.    It is contended by the learned proctor for the libelant that this clause does not exonerate the respondent, for that it does not relate to delay in berthing the ship.    This is by no means clear.    The exonerating language seems to relate to the entire voyage

for which the Barfod was chartered, but if it were otherwise the delay in placing the vessel in her berth would have been damnum absque injuria, for it would have been wholly idle to berth the vessel when on account of the strike the charterer could not have begun to deliver or stow the cargo. So the Barfod would have been in no better plight at the wharf than she was when lying at anchorage. In either case there would have been a delay of 15 or 17 days directly chargeable to the strike.

The loading having been completed, the master of the Barfod signed the bills of lading, accepted the customary gratuity from the shipper, and cleared at the custom house on the 5th of September. It was now the duty of the respondent to tow the Barfod to sea at the earliest practicable hour. This was especially true in view of the long, but as we have seen unavoidable, delay occasioned by the strike. The bark was, however, not carried across Julington bar until the 10th of September, and not until the 13th was she towed over the outer bar. Stormy weather and heavy winds, it is alleged, occasioned this delay. It is unquestionably true that the weather which usually prevails on the Atlantic coast of the Southern states at this season is not favorable to sailing vessels in similar plight with the Barfod. It is the season of violent storms, sometimes termed the "equinoctial." One witness, a pilot, testified that there was bad weather from the 1st to the 10th of September, and that it was dangerous to take a vessel out. From the logbook of one of the tugs the following entries were abstracted:

"September 4th. Wind blowing hard from E. N. E. At 5 p. m. we hove our anchor up, and run up to Julington for a harbor. Wind blowing strong from the E. N. E. Barometer 29.9."

"September 5th. At 8 p. m. the wind began to increase, and the barometer fell one-tenth."

"September 6th. Wind blowing very strong from east, and the barometer falling, we taken the large hawser from below and made it fast to the piling ashore and hove taut on it to help anchor. Received word from the Dandy (another tug) that storm signals were up. Made everything secure. Barometer 29.6."

The log of the Barfod also shows that on the 5th there was a gale. From the 5th to the 8th of September the testimony of the pilot and the logbook of the Timmons show that it would have been dangerous to have attempted to carry the Barfod, a vessel drawing 21 feet, across the bars. But on the 8th the weather seems to have moderated, and there appears to have been no reason for further delay in carrying the Barfod to sea and in starting her on her homeward voyage. Sapelo is an arm of the ocean, and its bar one of the best on the Atlantic coast, having 24 feet of water at high tide. It takes two days in that port to carry a vessel of the draught of the Barfod over both bars and to sea. She could easily have been given her offing on the 9th, and we think, therefore, that the Actieselskabet Barfod is entitled to a decree for damages in the nature of demurrage from that date until the 13th, when she was carried to sea, namely, four days, which at the stipulated rate will amount to $280.

While we have some doubt as to the apportionment of costs, since all the witnesses for the respondent are employés of the Hilton & Dodge Lumber Company or officially connected with it, and since the

Norwegian sailors who have their all invested in their one ship, the Barfod, were in no sense responsible for the strike, and yet if charged with any part of the cost would receive no compensation whatever for the great hardship and loss they have actually experienced, and since there was but one witness sworn for the libelant and many witnesses for the respondent, whose claims can be readily adjusted by the respondent company at a minimum of outlay, it is believed on the whole, in accordance with the sounder principles of justice, to charge the respondent with the entire costs.

Decree will be taken in accordance with these views.