# UNITED STATES v. COAL CARGO OF THE HENRY COUNTY.

# SAME v. COAL CARGO OF THE FRANKLIN COUNTY.

(District Court, E. D. Pennsylvania. October 16, 1924.)

## Nos. 95, 96.

1. **Shipping** ⟨key⟩178—**Strike of trainmen employees at port held cause of delay in loading steamer, so as to relieve shipper from liability under contract excepting delays because of strikes.**

Chief cause of delay in loading steamers with coal *held* to have been a strike of trainmen employees, resulting in practical tie-up at port, so as to relieve shipper from liability under contract excepting delays caused by strikes.

2. **Shipping** ⟨key⟩178—**Shipper, not knowing of strike at time of making designation of loading port, held to have used due diligence as affecting his liability for delay.**

Shipper *held* not to have failed to use due diligence in designating loading port for vessel after strike of trainmen occurred, where shipper's agents, when they made designation, did not know of strike, as affecting his liability for delay.

3. **Shipping** ⟨key⟩178—**Shipper, designating loading port where strike had occurred, did not fail to use due diligence by not providing cargo at different port, where strike was of lesser extent.**

Shipper, after designating loading port where strike of trainmen had occurred, *held* not to have failed to use due diligence by not providing cargo at different pier, where strike was on to lesser extent.

4. **Shipping** ⟨key⟩184—**Statement of coal exchange official relative to rules of exchange for handling coal is not evidence relative to particular shipment.**

Statement of official of coal exchange relative to possibilities of obtaining coal under general rules of exchange cannot be accepted as evidence as to possibilities of particular shipment.

5. **Evidence** ⟨key⟩597.

Suggestions of counsel, however plausible, cannot take place of evidence.

6. **Shipping** ⟨key⟩184—**After excepted cause of delay in loading cargo is proven, carrier must show affirmatively that reasonable diligence would have avoided it.**

Once the existence of excepted cause of delay in loading cargo is proven, it is incumbent on carrier to show affirmatively that exercise of reasonable diligence on part of shipper would have avoided it.

7. **Evidence** ⟨key⟩11.

It is common knowledge that, during spring and summer of 1920, situation as to railroads, coal industry, and exportation of coal was abnormal.

8. **Trial** ⟨key⟩396(2)—**In absence of evidence, court was not justified in finding it would have been practicable to divert ships to different loading port than one where strike was on, and furnish cargoes at such port, as affecting liability for delay in loading.**

In absence of evidence on the subject, court was not justified in finding as a fact that under existing conditions it would have been possible or commercially practicable for shipper to have diverted ships to different loading port than one where strike was on, and furnish cargoes at such place, as affecting liability for delay in loading.

9. **Shipping** ⟨key⟩179—**Order of Interstate Commerce Commission, incidentally aggravating strike situation at loading port, held not to constitute a "restraint of princes."**

Service Order No. 6, issued by Interstate Commerce Commission, requiring railroads to give priority to coal consigned to New England, *held* not to constitute a "restraint of princes" in excepted cause of delay in loading cargo, where order proved nothing more than incidental aggravation in situation caused by strike at loading port.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Restraints of Kings or Princes.]

10. **United States** ⟨key⟩129—**Sovereign acts of United States for general good cannot be used as defense to libel by United States for delay in loading cargo.**

Sovereign acts of United States, performed for general good, cannot be set up as defense to libel for delay in loading cargo, simply because United States was libelant.

11. **Shipping** ⟨key⟩184.

In action for delay in furnishing cargo, evidence *held* sufficient to show readiness of steamers to load on date called for in contract.

12. **Admiralty** ⟨key⟩79—**Libel will not be dismissed because of lack of proof in case in chief, where deficiency is supplied by after admitted evidence.**

Mere failure to dismiss a libel for lack of proof in libelant's case in chief is not ground for dismissing it, if, by reason of evidence admitted after refusal to dismiss, initial deficiency of proof is supplied.

13. **Shipping** ⟨key⟩184—**Evidence held to show that shippers had full cargoes for shipment on date of contract, although prevented from loading by strike.**

In action for delay in furnishing cargo, evidence *held* to show that shippers had full cargoes of coal ready for shipment on date of contract, although prevented from loading because of strike.

In Admiralty. Libels by the United States against a cargo of about 3,253 tons of coal on board the steamship Henry County, and against a cargo of about 3,248 tons of coal on board the steamship Franklin County. Libels dismissed.

Decree affirmed, 11 F.(2d) 809.

George W. Coles, U. S. Atty., and Joseph L. Kun, Asst. U. S. Atty., both of Philadelphia, Pa., and Harold F. Birnbaum and Arthur M. Boal, both of Washington, D. C., for the United States.

T. Catesby Jones and James W. Ryan, both of New York City, and Howard H. Yocum, of Philadelphia, Pa., opposed.

McKEEHAN, District Judge. These two cases were tried together. They are libels by the United States of America, as owner of the steamers Henry County and Franklin County, to recover from the respondent demurrage charges alleged to have been earned in the port of Philadelphia in June and July, 1920; the claim on the Henry County being $60,842.58, and on the Franklin County $57,095.71.

By two contracts of affreightment, dated May 28, 1920, the libelant agreed with William Jacks Company, Limited, of Scotland, to carry on each of these vessels a full and complete cargo of about 3,150 tons of coal from Philadelphia, Baltimore, or Hampton Roads to one safe French Atlantic port. The relevant clauses of the contracts, which were identical, are as follows:

"Witnesseth, that the said party of the first part agrees to freight on the said steamer from *Philadelphia, Baltimore, or Hampton Roads—one loading port to be declared before vessel sails from New York—* to one safe French Atlantic port (*see addenda 1, reverse side*), or as near thereunto as she may safely get and always lie afloat, and there deliver a full and complete cargo of about 3,150 tons of coal on the terms following:

\*    \*    \*    \*    \*

"3. The act of God, restraint of princes, rulers and people, fire and all and every other dangers and accidents of the seas, rivers, and steam navigation of what nature and kind soever, riots and strikes always mutually excepted.

"4. Lay days for loading, if required by the party of the second part, not to commence before *June 5, 1920;* otherwise, lay days to commence from time steamer is ready to load (or within forty-eight hours after readiness to load, if delayed awaiting turn at berth) and master has given notice in writing of such readiness to the party of the second part or his agent, who is ———. Should the steamer not be ready for cargo at her loading port on or before *June 25, 1920,* the party of the second part, or his agent, may at his option cancel this contract of affreightment at any time not later than

the day of the steamer's readiness to load. Cargo to be loaded into steamer with customary dispatch, in accordance with the rules of the port of loading, but in no case at less than *1,500* tons per running day, Sundays and legal holidays excepted. Any time lost through riots, strikes, lockouts, or disputes between masters and men, at docks, or by reason of floods, frosts, fogs, or storms, or by reason of accidents to ship's tackle, winches, equipment, or other disability of the ship which prevents her taking cargo, that occasions a stoppage of delivery of coal to said steamer is not to be computed as part of the loading time. In the event of any stoppage or stoppages arising from any of these causes and continuing for a period of six running days from the time when the steamer is ready to load, the party of the first part may, at its option, terminate this contract, without prejudice, however, to any rights of action which it may have; if any cargo shall have been loaded prior to the exercise of this option, same shall be discharged at the risk and expense of the party of the second part.

\*    \*    \*    \*    \*

"6. Also, that for each and every day said steamer is on Demurrage at either loading or discharging port, the party of the second part, or agent, shall pay to the party of the first part, day by day, demurrage at the rate of one dollar per net registered ton of steamer per running day, or pro rata for part of a day."

On the afternoon of June 18th, or morning of June 19th, the respondents' agent directed the libelant's agent that the vessels would load at Philadelphia. The letter conveying these instructions was dated June 19, 1920, and reads: "We hereby beg to advise that both the above vessels will load at Philadelphia, and should report immediately on arrival there to the Maryland Coal & Coke Company at Port Richmond piers. This cancels all previous instructions regarding the loading of these vessels."

The Henry County sailed from New York on June 20th at 11:30 a. m., and arrived at Philadelphia and reported as ready to load on June 21st at 1:25 p. m. The Franklin County sailed from New York on June 20th at 6 p. m., and arrived at Philadelphia and reported ready to load on June 22d at 9 a. m. About a month elapsed before the vessels were actually loaded. The Henry County was assigned a berth on July 23d at 9:20 a. m., docked at noon on that day, and was completely loaded on July 27th at 1:15 p. m. The Franklin County was as-

signed a berth on July 26th at 3:45 p. m., docked at 6:20 p. m. on that day, and was completely loaded on July 28th at noon. A few days later, August 2d, both vessels cleared, the Henry County at 10:45 a. m. and the Franklin County at 10:30 a. m.

The defenses are, first, that the delay in loading was caused by a strike, which was an excepted cause in the contract; second, that the libelant, through Service Order No. 6 of the Interstate Commerce Commission contributed to the delay in loading the vessels; and, third, that the libelant failed to prove that the vessels were ready to load at Philadelphia on June 21st or 22d. The libelant replied to these defenses, first, that the respondent failed to use due diligence by designating Philadelphia as the loading port after the strike had been declared there, and in failing to provide a cargo at the Greenwich piers in Philadelphia, when the Port Richmond piers were hampered by the strike; second, that Service Order No. 6 did not prevent or delay the loading of the ships, and that, even if it did, it was not a hindrance interposed by the owner of the vessels, within the meaning of the law; third, that the evidence of the readiness of the vessels to load was sufficient.

The strike referred to occurred at Port Richmond on June 18th between 4 and 6 p. m. Between these hours all of the trainmen employed there, some 380 in number, walked out. It was the so-called "outlaw strike of switchmen," which affected a number of roads in varying and intermittent degrees during the spring and summer of 1920. This strike resulted immediately in a practical tie up at Port Richmond, as the trainmen were the ones who brought or "drilled" the cars from the classification yards to the pier, and it was impossible to load vessels without them. A few of the men were induced to return promptly. Strike breakers were also employed, and after two or three days partial operations were resumed, and proceeded at about one-fourth of normal until August 12th, when the strikers returned to work. A similar strike occurred at the Greenwich piers, the other coal-loading point in Philadelphia, which largely tied up operations at that place on June 20th and 21st, though it was not so severe as at Port Richmond, and operations were soon restored to normal.

[1] I think it clear that the primary, chief, and controlling cause of the delay in loading these steamers at Port Richmond was the strike. Indeed, as I understand it, this is disputed only in the sense that the libelant contends that due diligence on the part of the respondent would have avoided this cause. The assistant trainmaster of the Philadelphia & Reading Railway Company, who had entire charge of the operation and handling of cars at Port Richmond, expressly testified that the cars would have been handled and unloaded in the regular way except for the strike. The chief tonnage clerk, who had charge of the coal department at Port Richmond and was to direct charge of the loading of vessels there, testified that he had coal on hand sufficient to load both vessels, and that it was the strike that prevented the loading. Prior to the strike only three or four days elapsed, from the time vessels registered as ready, to the time when berths were assigned them. This strike caused an immediate accumulation of vessels, which continued throughout the period of the strike, with a resulting delay.

[2-8] I cannot agree with the libelant's contention that the respondent failed to use due diligence in designating Philadelphia as the loading port after the strike had occurred. In the first place, the respondent's agents, when they made the designation, did not know of the strike. They apparently learned of it on the afternoon of June 19th or June 20th, the latter day being Sunday. Both vessels sailed from New York on that Sunday. It would scarcely have been possible for the agents to have been sufficiently in possession of the facts to enable them to have canceled the designation before the vessels cleared New York. Even had they known the facts, in so far as it was possible to know them at the time, they cannot, I think, be justly charged with negligence, or a lack of diligence, in designating the port of Philadelphia. So far as this record discloses there was no reason at the time to think that the strike would be at all protracted. It was evidently intermittent and of varying degrees. For instance, although the trainmen at Greenwich Point also struck on June 20th, that strike was extremely short, and normal operations were resumed at Greenwich Point in a few days. When the respondent designated Philadelphia as the loading port, he was not acting unreasonably or negligently or with a lack of due diligence.

Nor can I accept the libelant's contention that, after the vessels arrived at Philadelphia, the respondent failed to use due diligence in not providing a cargo at the Greenwich piers, when the Port Richmond piers were hampered by the strike. When these vessels reached Philadelphia, the strike was on also at Greenwich piers, which did not get back to normal

operating conditions for several days. Some time prior to the sailing of the vessels from New York, the respondent had arranged with the Maryland Coal & Coke Company to supply the coal. Sufficient coal for both cargoes had been put on wheels and was in transit to Port Richmond. It was not possible at the time to buy spot coal in Philadelphia. Libelant's counsel contend that, when the respondent saw that the strike at Port Richmond was still in effect, but that loading at Greenwich Point was about back to normal, it could have and should have avoided the delay at Port Richmond by having the vessels loaded at the Greenwich piers. The contention is that "the charterer could have shipped coal direct from the mines to the Greenwich pier, or the charterer, through a member of the Tidewater Coal Exchange, could have put coal on wheels consigned to the Tidewater Coal Exchange at Greenwich pier, and drawn on his bond, or the Maryland Coal & Coke Company could have routed the coal it had on wheels already to the Greenwich pier instead of to Port Richmond, or the charterer could have bought coal on wheels and consigned to the Greenwich piers."

As to this, I can only say that the libelant has offered no evidence to show that it was possible or practicable for the respondent to have resorted successfully to any of these expedients under the conditions that actually existed at the time. The only evidence that can be referred to as substantiating the contention is a statement upon which the libelant relies, made by Mr. Magruder, one of the officials or employees of the Tidewater Coal Exchange, who testified that, although each pool was a separate and distinct unit of ownership, still, if a man had the proper quantity in a pool at either the Greenwich or Port Richmond piers, and had a sufficient bond, and had the coal running to that pier, he could obtain it there under the general rules of the Exchange. This was simply a statement made by the witness in the course of describing the rules and regulations for handling coal through the Tidewater Coal Exchange. He was not speaking at all of this particular shipment, or this particular shipper, or this particular time.

Suggestions of counsel, however plausible, cannot take the place of evidence, and while I recognize the rule that the mere existence of an excepted cause of delay does not permit a charterer to fold his hands and sit idly by when, by the exercise of reasonable diligence, he might avoid the delay, still, once the existence of an excepted cause is proved, it is incumbent upon the libelant to show affirmatively that the exercise of reasonable diligence on the part of the respondent would have avoided it. It is common knowledge that, during the spring and summer of 1920, the situation as to railroads, the coal industry, and the exportation of coal was abnormal. The evidence in this case being barren on the subject, I think the court would be taking a very long and quite unjustifiable step in finding as a fact that, under the actual conditions as they existed at the time and place in question, it would have been either possible or commercially practicable for the respondent to have diverted these ships to Greenwich Point and furnished their cargoes at the latter place.

While the foregoing findings and conclusions resolve the case in favor of the respondent, several other points were raised and argued, and it may be as well to comment briefly upon them.

[9, 10] The respondents urge that the libelant itself contributed to the delay through the issuance by the Interstate Commerce Commission of what is known as Service Order No. 6, which was issued on June 19, 1920, became effective on June 24th, and required all railroads handling bituminous coal to any . tidewater transshipment pier from Charleston, S. C., north, to give priority to coal consigned to New England. The scope and effect of this order was examined and explained by Judge Rose in Hellenic Transport S. S. Co. v. Archibald MacNeil & Sons in (D. C.) 273 F. 290. Mr. Bowman, chief tonnage clerk at Port Richmond, testified that this order somewhat added to and aggravated the confusion caused by the strike, of which I have no doubt. But, if the respondent's contention is that this order constituted a "restraint of princes," which was an excepted cause in the contract, the proof was clearly insufficient, since the order proved to be nothing more than an incidental aggravation in the situation. And if the respondent's contention is that the order constituted a hindrance interposed by the libelant, within the meaning of the rule laid down in U. S. v. Peck, 102 U. S. 64, 26 L. Ed. 46, the contention falls for the further reason that, "though the sovereign acts of the United States performed for the general good may work injury to some private contractors, such parties gain nothing by the mere fact that the United States are defendants." Jones and Brown's Case, 1 Ct. Cl. 383.

[11, 12] The respondent further urges that

the libelant failed to show that these steamers were "ready to load" when they arrived at Philadelphia, or when they were ordered to go from New York to the Port Richmond piers. I am inclined to think that the evidence offered by the libelant in its case in chief was deficient on this point. But the proof furnished by the whole evidence was sufficient. Both of these vessels were surveyed only three or four weeks before these contracts of affreightment were made, and were classed by Lloyds as 100 A–1. They took on fuel sufficient for the voyage before leaving New York. They made the trip from New York to Philadelphia in about 24 hours. They immediately reported as ready to load, and lay here for a month awaiting assignments of berths. Immediately upon receiving such assignments, they docked, were loaded, and shortly thereafter cleared. These facts and circumstances, considered together, furnished sufficient proof of readiness.

It may be contended that, in the absence of sufficient evidence in the case in chief, the motion to dismiss should have been sustained, and that the libels should now be dismissed for the same reason as was laid in the motion. But I think that, in analogy to the rule regulating nonsuits, the mere failure to dismiss a libel for a lack of proof in the libelant's case in chief is not ground for dismissing it, if, by reason of evidence admitted after a refusal to dismiss, the initial deficiency of proof is supplied. Bostwick, Executor, v. Willett, 60 A. 398, 72 N. J. Law, 21.

[13] The libelant made some effort to show that the respondent was not in a position to furnish the cargoes at Greenwich piers when the vessels reported themselves ready to load, though I am in doubt whether this contention is pressed. Be that as it may, I find that, under the rules and operations of the Tidewater Coal Exchange, the respondent had full cargoes of coal ready at the Port Richmond piers on June 21st and 22d. The officers of the Maryland Coal & Coke Company expressly so testified. The testimony of chief tonnage clerk and of the witness Magruder was to the same effect. The respondent actually had a credit of 928 tons at Port Richmond on June 20th and 1,280 tons on June 22d. Furthermore, coal sufficient to supply both cargoes had been put on wheels early in June and was en route to Port Richmond. The Maryland Coal & Coke Company had given two bonds to the Tidewater Coal Exchange, aggregating $50,000, which entitled it to draw additional coal from the pools to the extent of 5,000 tons over and

above its actual credit, providing the coal was on wheels. These facts, considered in connection with the effect of the 10 per cent. more or less clause, gave the charterer the right to draw 6,720 tons from the classification yards at Greenwich Point.

I think there is no doubt that, if the strike had not intervened, these ships would have docked promptly after their arrival at this port, and would have received the cargoes which the respondent had in readiness for them at Port Richmond, within the loading time allowed respondent under the contract; and, as the parties expressly agreed that time lost on account of strikes was not to be computed as part of the loading time, the respondent is not chargeable with demurrage for the time so lost.

The libels are dismissed, at the cost of the libelant.