## CONTINENTAL GRAIN CO. v. ARMOUR FERTILIZER WORKS.

District Court, S. D. New York.
Jan. 27, 1938.

50

Haight, Griffin, Deming & Gardner, of New York City (Herbert M. Statt and J. Ward O'Neill, both of New York City, of counsel), for libelant.

Duncan & Mount, of New York City (Frank A. Bull and John H. Galloway, Jr., both of New York City, of counsel), for respondent.

LEIBELL, District Judge.

This is an action in admiralty commenced on or about March 12, 1936, by libel in personam to recover damages for breach by respondent of a voyage charter party, dated November 9, 1935, between libelant, as time charterer of the American Steamship Buffalo Bridge, and respondent, as voyage charterer and consignee of the cargo. Practically all of the testimony was taken by depositions.

The Buffalo Bridge was a steamship of 1,987 tons net register from the home port of San Francisco, owned by the Nelson Line and chartered to the Continental Grain Company, libelant in this action, as time charter owner. On November 9, 1935, a charter party was arranged between the Continental Grain Company and the Armour Fertilizer Works, respondent in this action, whereby the respondent chartered a part of the Buffalo Bridge for a voyage from the Seaboard Air Line Railway Company pier, Tampa, Fla., to alongside the dock of the Armour Fertilizer Works, Houston, Tex., or so near thereto as she could proceed with safety and there deliver her cargo. The respondent agreed to provide a part cargo of 1,000 gross tons of phosphate rock in bulk, under deck, and to pay for the use of said vessel during the voyage aforesaid $1.25 per ton of 2,240 pounds, freight payable on the outturn weight delivered.

A copy of the charter party is annexed to the libel and is entered as Libelant's Exhibit 2. It contains, among others, the following clauses:

"3. The act of God, Restraint of Princes and Rulers, the Country's Enemies, fire and all and every other dangers and accidents of the seas, rivers and steam navigation of what nature and kind soever during the said voyage, riots, strikes, fire, floods or any extraordinary occurrence beyond the control of either party, always mutually excepted.

"4. It is agreed that the lay days for loading and discharging shall be as follows, commencing from the time the master reports his vessel ready to load or discharge cargo, vessel taking her regular turn at loading port:

"Loading as customary. One weather working day, Sundays, holidays and half holidays excepted shall be allowed charterers for discharging. Charterers to load, trim and discharge cargo free of expense to vessel. Vessel is to be free of wharfage at both loading and discharging ports.

"5. Also, that for each and every day's detention by default of said party of the second part, or Agent Two Hundred and Fifty Dollars ($250.00) per day, day by day, shall be paid by the said party of the second part, or Agent, to the said party of the first part, or Agent.

"6. The cargo or cargoes to be received and delivered alongside the vessel at such wharf or place as charterers, or their Agents, may designate, where she can load and discharge, always safely afloat, with

reach of her tackles; and lighterage, and also extra lighterage, if any, at the risk and expense of the cargo.

"Charterers to have free use and owners agree to furnish vessel's steam, gear, winches and equipment for loading and discharging at all times. Vessel at all times to maintain sufficient steam so that all winches may be operated simultaneously to full capacity. Charterers are not liable for any straight time or overtime on vessel's crew or for any charge of any kind or character on vessel's crew."

The Buffalo Bridge arrived at Tampa and the cargo was loaded. On November 17, 1935, the loading was completed and the master of the vessel, Capt. Rogenes, issued bills of lading for 50 net tons of phosphate rock in bags and 1,002.6785 gross tons of crude dried phosphate in bulk. (Libelant's Exhibits 3 and 4.) On Wednesday, November 20, 1935, the vessel arrived alongside the dock of the Armour Fertilizer Works at Houston, Tex., around 10 p. m., and the next morning at approximately 8 a. m. the master served notice of readiness to discharge upon W. C. Kendrick, plant superintendent of the Armour Works at Houston. (Libelant's Exhibit 1.)

There was, at that time, an International Longshoremen's Association strike in Houston which had commenced on or about October 10, 1935, and the situation was apparently rather tense. However, the Maritime Committee of the Houston Cotton Exchange and Board of Trade, an association of steamship agents, owners, and operators, had undertaken co-operative measures to secure the opening of, and to keep open, the port of Houston during the strike. The Maritime Committee obtained independent longshore labor, quartered them upon certain docks under armed guard, and was thus able to reopen the port approximately one week after the commencement of the strike and to enable ships to load and discharge cargo. During most of the time there were 1,000 to 1,300 men, under the supervision of the Maritime Committee, available for that work.

All that was necessary was that application be made to the Maritime Committee by the party who desired to have a ship loaded or discharged and that the party agree to abide by the rules and regulations of the committee and to pay specified charges or assessments over and above the regular stevedoring rates for the purpose of defraying the expense of obtaining stevedores and for housing and maintaining them. The amount of the assessment was 1½ cents per ton for cargo handled by mechanical conveyor and 5 cents per ton for all other cargo, including scrap iron. However, the party desiring labor had to also agree to pay this same assessment on all its ships handled by members of the Maritime Committee in the port of Houston after the strike until all the strike expenses were defrayed.

Mr. Kendrick, the Armour superintendent, had always employed ILA men to unload phosphate rock at the Armour dock. When he heard that the Buffalo Bridge was bringing in a cargo, he went to see one Isbell, the ILA representative in Houston, the day before it arrived, and he was told that no ILA men could discharge the cargo; but he claims that Isbell led him to believe that the ILA would not interfere with the unloading if only Armour men did the stevedoring.

On November 21st Kendrick went aboard the Buffalo Bridge around 7 or 8 a. m. and at the same time started his men rigging a hopper on the Armour dock to receive the phosphate rock and convey it into the plant. He introduced himself to John Thornes, the first mate of the vessel, and told him of the arrangements. According to Kendrick's testimony, the mate said that he had a West Coast crew aboard and couldn't promise him a thing; that the ILA and the International Seamen's Union had a working arrangement between themselves and that the members of the ISU from the West Coast would not permit any but ILA men to work their ships. Thornes testified that they merely discussed the arrangements and the fact that Kendrick had obtained a permit to discharge the cargo with his own men.

At about 11 a. m. on November 21st, the hopper having been rigged up, Kendrick returned to the vessel with five of his employees from the Armour plant. They started to use the ship's winches and removed the hatch covers. However, they replaced them almost immediately and left the ship for the remainder of the day, without having discharged any cargo. According to respondent's witnesses, this was due to the fact that several men from the crew of the Buffalo Bridge accosted Kendrick on the dock and threatened violence

to him and his men if they tried to discharge cargo and said they wouldn't supply steam for the winches. One of the seamen, who was the ship's delegate, did most of the talking. None of the libelant's witnesses saw this occurrence, but later that day Kendrick spoke of it to the captain and pointed out the seaman, who was one Frederickson. The captain questioned Frederickson and he denied making threats, saying that he had merely asked why the Armour men didn't finish their job when they replaced the hatch covers. The captain called the crew together and they denied interfering with the Armour employees.

Between 1 and 2 p. m. the captain went to Kendrick's office and repeated what he had heard from the crew and told him that he could proceed with the unloading. The next day, Friday, November 22d, at about 7 a. m., the same Armour men went aboard the ship and started to discharge the cargo, using the ship's winches. They were inexperienced and made little progress, discharging only 213 tons; but steam was available all day. About 5 p. m. Kendrick saw a crowd of men coming to the ship and went down on the dock to meet them. There were about 12 or 15 in all. They were both ILA men and seamen who had quit the Buffalo Bridge. One Fite, an ILA official, said they were no longer able to control the men and that, if Armour continued to discharge the cargo, there was going to be trouble. All of the Armour plant men left the ship and refused to work there any more. They had to pass by the ILA headquarters and through picket lines to get to the plant and they were afraid of violence.

On November 22d Capt. Rogenes gave Kendrick a letter (Libelant's Exhibit No. 5), stating that the vessel was on demurrage. Kendrick refused to accept it, and three days later Rogenes sent it to him by registered mail.

On Saturday, November 23d, Kendrick went to the ILA headquarters on the suggestion of Fite, and a meeting was held at which 50 or 75 ILA men were present. They seemed to feel that Kendrick had used improper means to get verbal permission to unload the ship. Kendrick was told that he could no longer work the ship with the men from the Armour plant.

Kendrick testified that on the same day, November 23d, he went to see a Mr. Samuel Dunlap of the Texas Transport & Terminal Company, a steamship agent and personal friend, and asked him to take over the discharge of the cargo. Mr. Dunlap was the regular agent for the Continental Grain Company, but Kendrick did not know that at the time; he was also a member of the Maritime Committee and chairman of a subcommittee organized for the purpose of assigning the independent labor to the various ships during the strike. According to Kendrick's testimony, Dunlap refused to handle the Buffalo Bridge, stating that it was a "hot ship." However, Dunlap testified that Kendrick did not ask him to take over the Buffalo Bridge and, moreover, that he, Dunlap, did not state that the ship was "too hot." Kendrick also testified that he spoke to one Craig of the Strachan Shipping Company, who likewise refused to handle the ship for the same reason.

On the same day, November 23d, Kendrick notified Capt. Rogenes that it was impossible for him to discharge the cargo, and that the Atlanta office of the Armour Fertilizer Company was going to try to handle the matter from their end. On the previous day, November 22d, Kendrick informed Dunlap that no further attempt to unload would be made, and Dunlap notified the Continental Grain Company of this fact. Finally, on November 24th, Dunlap, at the request of the Continental Grain Company, took over the ship as their agent.

The Buffalo Bridge was moved on November 25th from the Armour dock to Municipal Pier 14. There was apparently some difficulty with the crew. When the order to shift berths at 1 p. m. was sent by Dunlap to Capt. Rogenes, the members of the crew who were left decided to go up to the ISU headquarters and find out whether they could handle the ship. The ISU representative told them to do so, and they returned to the ship and handled the lines while two tugs moved the vessel. The ship arrived at Pier 14 at about 5 p. m.

The independent stevedores employed by the Maritime Committee began to discharge cargo on November 26th under armed guard and continued to do so on the 27th and the 29th. The ship's winches were not used, although steam was always available. The unloading was accomplished by means of a crane on the dock, as the cheapest manner of handling the cargo. The phosphate rock was load-

ed into railway cars and run over to the Armour plant, where it was unloaded by plant employees. At about noon of November 29th the cargo was completely discharged. There was no interference by any of the remaining members of the crew.

Following the discharge, Capt. Rogenes moved the vessel with the aid of two tugs to Buffalo Bayou, a few miles from Pier 14, and tied up there. He then tried to obtain a full crew; he was 10 or 11 men short. The ship had a charter to load sulphur at Freeport, which was about an 8-hour run from Houston. Although the ISU officials were perfectly willing to have the men sign on, the men themselves would not do so. Their reason for refusing was that because of the labor troubles they would not sign up on a West Coast boat, fearing violence when they would arrive at a West Coast port.

Finally, because of the delay, the Continental Grain Company lost the Freeport charter and the vessel lay in the Bayou for about two weeks. The strike was settled around the middle of December, and a full crew was signed about three days before the vessel sailed December 16th.

The libelant seeks damages in the sum of $12,979.92, which sum is comprised of the following items: Demurrage charges, $1,875; cost of shifting berths and unloading cargo, $1,854.92; and the cost of cancellation of the time charter because of the loss of subsequent cargo due to unreasonable detention, $9,250.

■ The primary consideration in this case is the applicability of clause 3, the general "strike exception" clause of the charter party, as a complete and sufficient excuse for respondent's delay and failure to discharge the cargo. The general "strike exception" clause in the charter party does not prevent the running of demurrage; some similar phrase is necessary in conjunction with the demurrage clause to free the charterer from the burden of paying demurrage when the delay is due to strikes, etc.

A review of the cases, wherein the courts have held that charterers were not liable for demurrage for delays due to strikes, reveals that, in addition to the general "strike exception" clause, the charters also contained stipulations exonerating the charterers from liability for demurrage when the delay was due to strikes, riots, etc., said stipulations being incorporated in or appurtenant to the "lay day" or "demurrage" clauses of the charter parties. See Wood v. Keyser, D.C., 84 F. 688; Hawkhurst S. S. Co. v. Keyser, D.C., 84 F. 693; Actieselskabet Barfod v. Hilton & Dodge Lumber Co., D.C., 125 F. 137; United States v. Coal Cargo of The Henry County, D.C., 11 F.2d 805; United States v. Russian Volunteer Fleet, D.C., 22 F.2d 187.

In the case of Yone Suzuki et al. v. Central Argentine Ry., Ltd. et al., 2 Cir., 27 F.2d 795, the charter party contained a general "strike exception" clause identical with the one in issue. Judge A. N. Hand in an opinion states (at page 804 of 27 F. 2d):

"The libelants, therefore, seek to resort to the general exception in clause 3 as to restraint of princes, accidents, riots, and strikes; but that exception cannot be regarded as applying to the running of the lay days which, as we have already stated, began by the express agreement of the parties when the vessel was 'at or off' the port of Buenos Aires.

"Demurrage is extended freight, and the strike exception, like that of restraint of princes does not stop it from running. Clyde Commercial S. S. Co. v. West India S. S. Co. (C.C.A.) 169 F. 275. There is an absolute contract to pay demurrage, and payment is not prevented by strikes. Moreover, the strike was in progress at the South Dock from the time these vessels arrived, and the railway should have exercised its option to name a different berth, and should have sent them somewhere else, if the strike would cause a delay. Its neglect ought not to prevent demurrage from running. The strike was not general, and other vessels were discharging at the South Basin and North Basin. Evans v. Blair (C.C.A.) 114 F. [616] 618; The Manta [New York & Cuba Mail S. S. Co. v. Lamborn], (C.C.A.) 13 F.2d 535; The Edward T. Stotesbury (C.C.A.) 187 F. 111."

■■ In the instant case, the strike was general in the port, but ships were being worked regularly and the respondent could have made arrangements for the discharge of cargo by applying to the Maritime Committee. This is not merely an assumption but an actual fact, because that is what was done when Kendrick abandoned all efforts to discharge the cargo. Kendricks' statement that Dunlap and Craig refused to handle the ship does not seem to be borne out by later events. Dunlap cate-

gorically denied ever being requested by Kendrick to do so, and, moreover, Dunlap did take over the ship just two days later as agent for the libelant.

During the period of November 20th to November 29th there were from 7 to 13 ships being worked every day, and from 1,000 to 1,300 men were available for stevedore work. It is true that Kendrick thought that he would be able to discharge cargo with his own men; but, when he found that this was impractical, he was obliged to endeavor to make other arrangements. Respondent's claims that steam was not available and that the vessel's crew interfered with the Armour men do not seem to be borne out by the testimony. Although some members of the crew were at one time dissatisfied because nonunion men were working cargo, they co-operated and furnished steam for the winches. Kendrick worked the boat for a full day. He evidently was influenced not to resume operations by a demonstration of some ILA members at the Armour dock at 5 p. m. November 22d. It further appears that all the West Coast seamen had been paid off on the 21st and 22d of November, and that the members of the crew who remained were not troublesome.

Respondent further contends that clause 5 of the charter party stipulates demurrage only for "detention by default of said party," and hence there should be no liability for demurrage, as the delay was caused by the strike. However, respondent fails to distinguish between the terms "fault" and "default"; a charterer may be held liable for demurrage, even though the detention of the vessel was not due to any fault on his part.

In the case of The Hans Maersk, 2 Cir., 266 F. 806, at page 808, Judge Ward stated: "The term 'default,' in the covenant to pay demurrage from day to day for every day's detention thereafter, does not mean that he is only liable to pay for delay due to his own fault, but means delay caused by his failure to perform his covenant that the vessel shall be loaded or discharged in the time agreed upon. He takes the risk of all causes of delay, except those due to the fault of the shipowner and to vis major."

Again in The Marpesia, 2 Cir., 292 F. 957, at page 969, Judge Rogers, after reviewing a number of cases, said: "The cases make it clear that 'default' in a charter party contract means failure to perform whatever the charterer was bound to do without regard to how the failure came about subject only to the vis major doctrine."

Under all the circumstances, I am of the opinion that the respondents are liable for demurrage in the sum claimed $1,875.

The second item of libelant's claim is for the expenses incurred by them in shifting berths from the Armour dock to Pier 14 and for discharging the cargo at Pier 14 and other expenses incidental thereto. Respondent contends that the demurrage charge as stipulated in the charter party is in the nature of liquidated damages and as such is the limit of recovery. In support of this argument respondent quotes Scrutton on Charter Parties and Bills of Lading, 13th Ed., p. 357, as follows: "Demurrage, in its strict meaning, is a sum agreed by the charterer to be paid as liquidated damages for delay beyond a stipulated or reasonable time for loading or unloading."

It is true that a demurrage charge is a sum agreed upon as liquidated damages, but said damages are "for delay"; they do not include each and every expense which might arise. As Justice Story said in The Apollon, 9 Wheat. 362, at page 378, 6 L.Ed. 111: "In truth, demurrage is merely an allowance or compensation for the delay or detention of a vessel."

According to the charter party, respondent agreed "to load, trim and discharge cargo free of expense to vessel." The loading was accomplished satisfactorily by respondent, but the libelant had to make arrangements and pay for discharging nearly all of the cargo. Steam and the ship's gear were always available to respondent while the vessel was tied up at the Armour dock. There was no actual interference by the members of the crew. The real reason for respondent's failure to discharge cargo was fear of violence by members of the ILA at the Armour dock.

When Kendrick notified both Dunlap and Captain Rogenes that he was going to make no further attempt to unload, libelant's action in moving the ship over to Pier 14 and there discharging cargo was, under the circumstances, reasonable. No objection was made to this procedure by respondent at the time, and libelant had a cargo waiting at Freeport and desired to get there with all possible dispatch. Moreover, it

would seem that libelant's action resulted in a mitigation of damages. Otherwise, the ship might have laid alongside the Armour dock on demurrage until the end of the strike, which was about December 16th. Hence libelant's claim for expenses incurred in discharging the cargo is allowed as per agreement under the charter party.

No bill of particulars has been introduced specifying the amount of said expenses; but there is, among the exhibits, a letter dated December 30, 1935, from libelant to respondent setting forth the various items of libelant's claim and requesting payment of the same. The items which comprise libelant's expenses incurred in discharging the cargo are as follows:

| | |
|---|---|
| Cost of discharging at substituted discharging berth as per summary account enclosed herewith | $1,567.43 |
| Agency fee of Texas Transport & Terminal Co. ................ | 100.00 |
| Telegraphic and telephone expenses of Simpson, Spence & Young in New York.......... | 87.49 |
| Continental Grain Co. telegraphic and telephone expenses....... | 100.00 |
| Sum total of said claim........ | $1,854.92 |

In view of the fact that there is insufficient proof with respect to some of these items and that several of them are disputed, said claim for expenses will be referred to a special commissioner to determine the amount and to report same to the court.

The largest item of libelant's claim is for $9,250, damages resulting from libelant's cancellation of its time charter because of the loss of subsequent cargo allegedly due to the delay caused by respondent's failure to discharge the vessel within a reasonable time. There is practically no evidence upon this point nor does it appear that respondent had any knowledge of this possible eventuality. Moreover, it would seem that the Buffalo Bridge could have left Houston on November 29th had the captain been able to obtain a full crew; the Freeport charter was not definitely canceled until December 3d or 4th. Just how respondent's failure to discharge in time contributed to this delay is not shown.

It would seem that, in the instant case, the failure of Capt. Rogenes to secure a full crew for two weeks after the discharge was completed was a new and intervening cause of the loss of the time charter. He sailed December 16th and got a full crew about three days before. Libelant's contention that the loss of the charter was due to respondent's failure to discharge cargo on time has not been established, and its claim for damages resulting from the loss of said charter cannot be allowed.

In Louisiana Mut. Insurance Company v. Tweed, 7 Wall. 44, at page 52, 19 L.Ed. 65, Justice Miller said: "One of the most valuable of the criteria furnished us by these authorities, is to ascertain whether any new cause has intervened between the fact accomplished and the alleged cause. If a new force or power has intervened of itself sufficient to stand as the cause of the misfortune, the other must be considered as too remote."

Libelant is entitled to a decree sustaining its libel, granting items 1 and 2 of its claim, the total amount thereof to be determined as above indicated.