ESSEX S. S. CO., Limited, v. LANGBEHN.

(Circuit Court of Appeals, Fifth Circuit. January 30, 1918. Rehearing Denied April 3, 1918.)

No. 3109.

SHIPPING ☞38—CHARTERS—EFFECT OF WAR.

Where the charter of a British vessel gave the charterer the privilege of naming either one of three European ports for discharging, and he in good faith selected and advertised Hamburg as the destination, the subsequent declaration of war between Great Britain and Germany, and the prohibition of trading with enemy ports, justified the master in refusing to take his vessel to Hamburg, and such refusal released the charterer from his contract, since by its terms he could not be compelled to select another port.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern District of Texas; Waller T. Burns, Judge.

Suit in admiralty by the Essex Steamship Company, Limited, against J. H. Langbehn. Decree for respondent, and libelant appeals. Affirmed.

W. T. Armstrong, W. B. Lockhart, and Eugene A. Wilson, all of Galveston, Tex., for appellant.

Maco Stewart, of Galveston, Tex., for appellee.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. The appeal involves the validity and construction of a charter party between the appellant, as owner, and the appellee, as charterer, for the alleged breach of which the appellant instituted this action against the appellee. The appellee concededly refused to carry out the agreement, justifying his refusal upon the changed conditions that arose, after the charter party was entered into and before its performance was entered upon, by the declaration of war between Germany and Great Britain. The salient facts are not in conflict. When the charter party was entered into, the ship was in the West Indies, and was ordered to Galveston to load. The charter party was executed July 9, 1914, and the vessel reached Galveston August 12, 1914. By the terms of the charter party the vessel was to be loaded any time between August 15th and September 15th, and she was ready for loading on August 18th. War was declared between Great Britain and Germany on August 4th, and shortly thereafter British ships were by proclamation prohibited from trading with enemy ports, and from carrying contraband and articles declared by the proclamation to be conditional contraband, until the master had satisfied himself that they had not an ultimate enemy destination. After the arrival of the vessel at the port of Galveston, the charterer asked the master whether, in view of the existing war, he was prepared to take his ship to Hamburg, which was the port the charterer had advertised as the destination of the ship before her arrival. The master in response declined to take his ship to Hamburg, and the charterer then declared the charter party canceled. Hamburg was one of the optional ports named in the charter party. Afterwards negotiations by cable between the owner's agents and the charterer were conducted, looking to the selection of another port than those named in the charter party; but the parties failed to agree on freight rates and the negotiations came to nothing. Finally the ship was rechartered to other parties to another port at advanced freight rates. The question presented for our decision is whether the onset of war discharged the parties to the charter party from its performance.

If the charterer had the right to select Hamburg as the port of discharge, it is manifest that the charter party was canceled by operation of law by the declaration of war. That the shipowner could not have been required to take his vessel to the enemy port, in violation of the law of his country and with the certainty that it would be seized by the enemy upon arrival there unless war had then ceased, has been

determined by the Supreme Court in the case of the Kronprinzessin Cecilie, 244 U. S. 12, 37 Sup. Ct. 490, 61 L. Ed. 960. If the owner was released by the state of war from performance of his part of the charter party, it follows that the charterer was released from the obligation resting on him. The release must be mutual, and not optional with the owner alone. This would be true, though the master had not declined to sail for Hamburg, upon arrival at Galveston. However, the record shows that the master declined to take his ship to Hamburg, and that the charterer accepted this as a termination of the charter party, as he had the right to do, if he had the right to insist on Hamburg as a port of discharge. The charter party, in this respect, provided:

"Vessel to load and being so loaded shall proceed to Rotterdam; one port only, as ordered on signing bills of lading. Charterers have the privilege of ordering the vessel to Antwerp to discharge. Charterers have the privilege of ordering the vessel to Hamburg to discharge."

We take this to mean that the charterer is to have the right of selecting any one of the three ports mentioned, but only one, and if he makes the selection in good faith, and without any purpose to evade performance of the charter party, we think the owner agrees to be bound by the charterer's selection, just as if the port selected was the only port of discharge named in the instrument. We cannot see what force the conferring of the privilege of selecting on the charterer would otherwise have. The charter party does not provide that, if the port selected is unavailable, the charterer shall be required to select one of the remaining two. He is given the unqualified privilege of selecting any one of the three ports named, and the only limitation it is susceptible of is that it be exercised in good faith. There is nothing in the record that impugns the good faith of the charterer in selecting Hamburg. He had listed and advertised Hamburg as the ship's destination in July before war was thought of, and he had grain in prospect for delivery there. It is true the charter party says that the port of discharge is to be declared on the signing of the bills of lading; but the master's refusal to take his ship to Hamburg was a waiver of this provision of the charter party. It would have been futile to have required the charterer to procure the grain for loading, in view of the master's declination.

Furthermore, the proclamation of the British government declared foodstuffs to be conditional contraband, and subject to seizure, if their ultimate destination was an enemy country, and prohibited British ships from transporting foodstuffs until satisfied their ultimate destination was not an enemy country. The grain the charterer had in prospect for loading the vessel with was originally destined by him for Hamburg, an enemy port. The charterer would certainly have been excused from loading it for Hamburg, even if the shipowner had agreed to carry it there. He was not required, as a prudent business man, to assume the risk of seizure. Even had the grain been shipped to either of the neutral ports mentioned in the charter party, the original destination intended for it, by the charterer, with the knowledge of the ship's master, would have made the likelihood of

seizure, upon the theory of ultimate enemy destination, greater than a prudent man would want to incur. Shipments of foodstuffs were prohibited by proclamation of the British government to both Antwerp and Rotterdam in British vessels, and this, too, increased the likelihood of seizure. Following the test laid down by the Supreme Court, in the case of The Kronprinzessin Cecilie, supra, as justifying nonperformance in case of war, or probable war, we think the hazard of the seizure of the cargo, even had it been shipped to one of the other two ports mentioned in the charter party, was greater than a prudent business man would have cared to incur, and that the appellee was justified in declining to carry out the agreement. Nor do we think that the subsequent and unsuccessful endeavors to enter into a new agreement to charter the vessel to other ports at different rates should be considered as a waiver of his refusal to carry on the old charter party or his right to stand on his previous declination to the master.

Concluding that the decree of the court below was correct, it is here ordered affirmed.