## UNITED STATES v. RUSSIAN VOLUNTEER FLEET.

District Court, S. D. New York. September 23, 1927.

**1. Shipping ⬤⟞45—Charter became limited to port designated by charterer as loading port in accordance with contract of affreightment.**

Where contract of affreightment specified different loading ports at charterer's option, charter became limited to port designated by charterer as loading port, particularly in absence of objection thereto by owner.

**2. Shipping ⬤⟞178—Charterer, under contract excepting liability for demurrage caused by strikes, held not liable, though having knowledge of strike at port designated for loading.**

Under contract of affreightment excepting delays caused by strikes from claims for demurrage, charterer did not become liable for demurrage charges arising from delay in loading, caused by strike at port designated by charterer as loading port, with no objection from owner, though both parties were aware that a strike existed at such port, since charterer had right to rely on agreement excepting it from liability in such case.

In Admiralty. Suit by the United States against the Russian Volunteer Fleet. Libel dismissed.

Charles H. Tuttle, U. S. Atty., of New York City, and Harold F. Birnbaum, Sp. Asst. U. S. Atty., of New York City.

Burlingham, Veeder, Masten & Fearey, William J. Dean, and Roscoe H. Hupper, all of New York City, for respondent.

GODDARD, District Judge. This suit was brought by the United States, as owner of the steamship Massilon Bridge, to recover alleged demurrage charges of $51,734.02.

On June 15, 1920, the libelant and respondent entered into a contract of affreightment whereby respondent agreed "to freight on the said steamer from Hampton Roads, Va., Baltimore, Md., Philadelphia, Pa., one port, charterers' option, * * * a full and complete cargo of about 4,000 tons of coal * * * to Sevastapol or Theodosia, Crimea, one port, charterers' option. * * * " Included in the contract were the following pertinent clauses:

"3. The act of God, restraint of princes, rulers and people, fire and all and every other dangers and accidents of the seas, rivers, and steam navigation of what nature and kind soever, riots and strikes always and mutually excepted.

"4. Lay days for loading, if required by the party of the second part not to commence before June 10, 1920; otherwise, lay days to commence from time steamer is ready to load (or within 48 hours after readiness to load, if delayed awaiting turn at berth) and master has given notice in writing of such readiness to the party of the second part or his agent. Should the steamer not be ready for cargo at her loading port on or before June 30, 1920, the party of the second part, or his agent, may at his option cancel this contract of affreightment at any time not later than the day of the steamer's readiness to load. Cargo to be loaded into steamer with customary dispatch, in accordance with

the rules of the port of loading, but in no case at less than 1,500 tons per running day, Sundays and legal holidays excepted, provided steamer can receive at this rate. Any time lost through riots, strikes, lookouts, or disputes between masters and men at docks or by reason of floods, frost, fogs, or storms, or by reason of accident to ship's tackle, winches, equipment, or other disability of the ship which prevents her taking cargo, that occasions a stoppage of delivery of coal to said steamer, is not to be computed as part of the loading time. In the event of any stoppage or stoppages arising from any of these causes and continuing for a period of six (6) running days from the time when the steamer is ready to load, the party of the first part may, at its option, terminate this contract, without prejudice, however, to any rights of action which it may have; if any cargo shall have been loaded prior to the exercise of this option, same shall be discharged at the risk and expense of the party of the second part.

\* \* \* \* \* \* \* \* \* \*

"6. Also, that for each and every day said steamer is on demurrage at either loading or discharging port, the party of the second part, or agent, shall pay to the party of the first part, day by day, demurrage at the rate of $1.00 per net registered ton of steamer per running day, or pro rata for part of a day."

### The Facts.

On June 26, 1920, the respondent designated Philadelphia as the loading port and thereupon the Massilon Bridge proceeded to that port, arriving there June 30, 1920, at 7 a. m., and was registered "for turn" at Port Richmond coal piers as of 9:45 a. m., and notice of readiness given to respondent. However, due to a strike of railroad switchmen and trainmen at Port Richmond, which began on June 18, 1920, and which affected the railroads in varying and intermittent degrees, there was a practical tie-up at Port Richmond as these men were the ones who brought or "drilled" the loaded coal cars from the classification yards to the pier, and it was impossible to load ships. After two or three days, some of the men returned to work and some strike breakers were employed, so that operations were resumed upon about one-quarter of the normal basis until August 12th, when the strikers returned to work and normal conditions again soon prevailed. A similar strike also occurred at the Greenwich piers, the other coal-loading pier in Philadelphia, which largely tied up

operations at that place on June 20th and June 21st, though it was not so severe as Port Richmond, and operations there were soon restored to normal. The Massilon Bridge finally received berthing orders at noon on July 28, 1920, berthed at 2 p. m., and completed loading a cargo of 4,022 tons of coal on July 31, 1920, at 9 a. m. The strike caused an immediate accumulation of vessels which continued throughout the period of the strike with a resulting delay. The cause of the delay in loading the Massilon Bridge at Port Richmond was the strike.

The cargo of coal which the respondent shipped on the Massilon Bridge at Port Richmond coal piers was purchased by it from W. A. Marshall & Co. by contract of June 1, 1920, under which it had the option to demand from the seller that the coal be delivered at Canton or Curtis Bay coal piers, Baltimore, or Port Richmond coal piers, Philadelphia.

The libelant did not have notice of respondent's contract with Marshall & Co. until October 19, 1921. Respondent arranged for the delivery of the coal at Port Richmond docks, Philadelphia, and on June 26th notified the libelant that Port Richmond, Philadelphia, was nominated as the loading port, and no objection was made by libelant.

The above facts are all conceded by both parties, and the respondent further admits that it knew of the existence of the strike when it notified libelant that Philadelphia was designated as the loading port; and I find from the record that the libelant at this time also was aware of the strike, for two of its steamers, the Henry County and the Franklin County, had arrived there on June 21st and June 22d, respectively, and, from correspondence of libelant, dated on those days, it appears that libelant realized that there might be difficulty in the Massilon Bridge's loading at Philadelphia. It also appears that libelant, after being aware of the strike in Philadelphia, on June 24th, six days after the strike began, signed a new agreement with the respondent, switching the Massilon Bridge to the libelant's steamer Faraby, which was under charter, and which would be unable to make her canceling date. The respondent had chartered both of these steamers for the purpose of lifting 6,900 tons of coal which it had bought from Marshall & Co. It further appears that ample spot coal could have been bought and loaded at Baltimore and at Hampton Roads, though shipping was congested at those ports during the period of the strike in Philadelphia.

Other than this, there is nothing to show that it was possible or commercially practical for the respondent to secure coal at another port. No spot coal was available in Philadelphia. Bad faith on the part of respondent has not been alleged or proven.

The defense to the claim for demurrage is that the delay in loading was caused by a strike which was excepted in the contract of. affreightment.

The libelant contends that the respondent cannot claim the benefit of the exception as to strikes, because it designated Philadelphia and Port Richmond pier after respondent knew that the strike was in effect there; that respondent should have, upon learning of the strike conditions, arranged to take on the coal which it had purchased from Wilson & Co. at Baltimore, where coal could have been loaded, and where, under its contract, respondent originally had the option under its contract with Marshall & Co. to have the delivery made instead of Philadelphia.

The facts in the case at bar are substantially the same as those in United States v. Coal Cargoes of Steamships Henry County and Franklin County (D. C.) 11 F.(2d) 805, affirmed (C. C. A.) 11 F.(2d) 809, certiorari denied, 273 U. S. 696, 47 S. Ct. 93, 71 L. Ed. ——, with the exception that in that case the charterer was not aware of the existence of the strike when it designated Philadelphia as the loading port, and in the present case the charterer did know that there was a strike at the loading port when it made the designation. It is on this feature that the libelant relies.

[1, 2] The contract excepted delays caused by strikes from claims for demurrage. This certainly meant strikes delaying the steamer loading at the loading port specified in the contract, and, in the absence of the loading port being stated in the contract, the one to be designated later. The shipper had the right to designate her loading port, and did so, and that port was accepted by the owner without objection. Upon designation of Philadelphia as the loading port, particularly as libelant made no objection to it (although it was aware that a strike there existed), the charter became limited to that port. Texas Co. v. Hogarth Shipping Co., 256 U. S. 619, 41 S. Ct. 612, 65 L. Ed. 1123; Tharsis Sulphur & Copper Co., Limited (1891) 2 Q. B. D. 647, 7 Asp. M. C. 106; Essex Steamship Co. v. Langbehn (C. C. A.) 250 F. 98.

To interpret the words in the contract, "strikes always mutually excepted," or "any time lost through riots, strikes, lockouts, or disputes between masters and men at docks * * * or by reason of accidents to ship's tackle, winches, equipment, or other disability of the ship which prevents her taking cargo, that occasions a stoppage of delivery of coal to said steamer, is not to be computed as part of the loading time," as meaning that if, when the time arrived for the shipper to designate the loading port, a strike existed at that port which might cause delay in loading, then that port was to be eliminated and the shipper must designate one of the other loading ports, would require reading into the clause words and a meaning not there by inference or otherwise and contrary to the idea which the parties had expressed in their own contract. Either party might have been placed in a situation where it found it desirable to invoke the benefits of the clause. On the shipper's part this clause enabled it to go ahead to make definite arrangements with Marshall & Co. as to the port where the coal was to be delivered, and without risk of claims for demurrage in the event that a strike or other specified causes delayed getting the coal on board ship. The shipper did arrange to take delivery from Marshall & Co. at Port Richmond Pier, Philadelphia. A strike did delay loading, and to deprive it of the benefits of this clause would be an injustice. A further safeguard in libelant's favor was the provision in the contract which gave it the option of withdrawing the steamer without prejudice, after six days' delay. The strike was known to both parties when the steamer sailed from New York to Richmond docks, and both were free to rely upon it as defense, should the situation arise.

Clause 3 of the contract provided "strikes always mutually excepted," which excepts strikes arising before as well as after the execution of the contract, and so logically it excepts strikes existing before as well as after the designation of the loading port. As Judge Ward said in Roessler & Hasslacher Chemical Co. v. Standard Silk Dyeing. Co. (C. C. A.) 254 F. 777, certiorari denied 250 U. S. 663, 40 S. Ct. 11, 63 L. Ed. 1196, referring to an exception of losses due to war: "It was evidently more important and appropriate to the existing war than to wars that might subsequently arise."

Probably at the time neither party knew how soon the strike at Philadelphia might be over, or, if it did continue, whether it might not spread to Baltimore, and no bad faith on the part of the respondent has been suggested, nor does it appear that the shipper

could have altered its arrangement and had Baltimore or Hampton Roads substituted as the port of loading instead of the Port Richmond piers, Philadelphia.

This is not a time charter case, such as Brown v. Turner (1912) App. Cas. 12, cited with other cases by libelant's counsel, and the conditions applying to delays of a chartered steamer are quite different for obvious reasons. The facts in the other cases cited by libelant's counsel differed in material respects from the case at bar.

In United States v. Coal Cargoes of Steamships Henry County and Franklin County, supra, Judge McKeehan, holding that the carrier was not entitled to demurrage charges, said (at page 807):

"Even had they [the shipper] known the facts, in so far as it was possible to know them at the time, they cannot, I think, be justly charged with negligence, or a lack of diligence, in designating the port of Philadelphia. So far as this record discloses, there was no reason at the time to think that the strike would be at all protracted."

English decisions support the view that respondent should not be held liable for delays due to the strike.

In Dobell & Co. v. Green & Co. [1900] 1 Q. B. D. 526, 9 Asp. M. C. 53, decided by the Court of Appeal, Collins, L. J., said:

"By the terms of the charter the shipowners come under the obligation to load on their ship a cargo of steam coal from a colliery which the charterers have a right to select, and the charterers take upon themselves the obligation of shipping such a cargo except in the event of (among other things) a strike. What right have the shipowners to complain on its being notified to them under the charter that the ship must go to a particular collier at which there is at the time of that notification a strike? It appears to me that at that point of time the existence of the strike is nihil add rem. The shipowners must send their ship to the place at which they have undertaken to load, and the charterers have undertaken to ship a cargo; and it is not until the ship has arrived there,

and the question as to the obligation of the charterers to ship the cargo arises, that the existence of a strike becomes material. The charterers are entitled to say to the shipowners, 'You must do what you have contracted to do; you must put your ship in position at the place which we have indicated; then, and not till then, the question whether we are relieved from the obligation which we have undertaken by reason of the existence of a strike will arise.' I think it would be unreasonable, having regard to the uncertainty of the duration of strikes, to impose upon the charterers an obligation to name a colliery where there was no strike in existence at the moment. Although there might be a strike in existence at the colliery named, that strike might be at an end at the time when the obligation of the charterers to load attached. I do not think that upon the true construction of the charter there is any such fetter imposed upon the option given to the charterers as is suggested by the plaintiffs." Pages 533, 534.

A. L. Smith, L. J., said:

"But, where can be found in the charter any term to the effect that an order must be given to load the coal from a colliery which is not on strike? As I have already pointed out, the charter party expressly provides that any loss arising from a strike is to fall upon the shipowners. I can find nothing in the charter which imports any such limitation of the charterers' right to select the colliery from which the coal is to be shipped as is contended for by the plaintiffs." Page 532.

See, also, Bulman v. Fanwick [1894] 1 Q. B. D. 179, 7 Asp. N. C. 388; Owners of SS. Matheos v. Louis Dreyfus & Co., 1925 A. C. 654.

I think that the respondent had the right to rely upon the clause in the contract of affreightment excepting it from claims for delay in loading caused by the strike, there being no evidence that it was negligent or that it could have, by reasonable diligence, avoided the delay, and accordingly the libel is dismissed.