**NEW YORK CROSS HARBOR RAILROAD TERMINAL CORP., Plaintiff,**

v.

**ATLANTIC MUTUAL INSURANCE COMPANIES, Defendant.**

No. CV 86–4091.

United States District Court,
E.D. New York.

Aug. 3, 1987.

Thomas L. Tisdale (Peter J. Zambito, of counsel), Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for plaintiff.

John T. Kotchendorfer (Donald T. Rave, of counsel), Bigham Englar Jones & Houston, New York City, for defendant.

MEMORANDUM AND ORDER

GLASSER, District Judge.

This action concerns a dispute about the meaning of an insurance policy and was

tried on stipulated facts, which the court shall summarize. Plaintiff New York Cross Habor Railroad Terminal Corp. (Cross Harbor) is a New York corporation that operated a vessel known as CARFLOAT 29. Cross Harbor carries railcars between Greenville Terminal in Jersey City, New Jersey and the Brooklyn Army Terminal in Brooklyn, New York. A carfloat is a barge fitted with rails. Cross Harbor pushes and stows railcars aboard the carfloat, which crosses New York Harbor with the assistance of a tug. When the carfloat arrives at its destination, one of two things happens: the railcars are unloaded and are either delivered to another railroad for further rail carriage—in the language of the industry, it is said that such cars are "interchanged"; or, after unloading, the railcars are delivered directly to the cargo consignee.

Defendant Atlantic Mutual Insurance Company (Atlantic Mutual) is also a New York corporation. On or about August 13, 1984, Cross Harbor and Atlantic Mutual agreed to an insurance policy numbered 120012807. In consideration of premiums, which Cross Harbor has paid, Atlantic Mutual agreed to insure Cross Harbor for the loss of or damage to cargo carried aboard its carfloats. CARFLOAT 29 was among the carfloats covered by the policy.

On November 13, 1984, at 10:05 a.m., CARFLOAT 29 left Greenville Terminal laden with fifteen railroad cars said to contain various types of bulk and liquid cargoes. The vessel reached her destination, Brooklyn Army Terminal, at 11:00 a.m. On the next day, November 14, at about 6:45 a.m., CARFLOAT 29, which was still laden with her cargo, was seen to be sinking at the stern. At 7:10 a.m., she listed to starboard and twelve of the railroad cars fell overboard. Early on the morning of November 15, CARFLOAT 29 sank in her entirety, alongside Pier 1 at the Brooklyn Army Terminal. She took the three remaining railcars down with her.

The events of November 13 through 15, 1984 took place during the pendency of the insurance policy that is the subject of this action. Following the casualty, Cross Harbor promptly reported the loss to Atlantic Mutual and made a claim under the policy.

On May 15, 1985, Cross Harbor filed a complaint for exoneration from or limitation of liability, pursuant to 46 U.S.C. § 183. The action was filed in this court and assigned docket number CV–85–1801. The owners of the cargo and railcars lost in the November 1984 incident filed claims for damages and claims for car-hire charges. These claims totaled approximately $1,000,-000.00. Eventually, all parties agreed that the claims would be settled for seventy-five percent (75%) of their face value. Atlantic Mutual's agreement, as Cross Harbor's insurer, was without prejudice to the terms of its policy now in dispute.

Atlantic Mutual has paid one cargo damage claim, that of Cargill, Inc. for $90,-582.51. It has also paid $246,010.79 as wreck removal of both cargo and the carfloat, plus "sue and labor" expenses and $30,468.83 as legal expenses in the defense of the cargo cases.

Atlantic Mutual has not paid the following cargo claims:

| | |
|---|---|
| Bethlehem Steel | $213,737.16 |
| Dow Chemical | 36,300.00 |
| Roseburg Lumber | 14,372.04 |
| Kohler Manufacturing | 13,586.07 |
| Tampa International Forest Products | 19,869.07 |
| Corn Products | 7,524.00 |

These claims total $305,388.34.

On claims for equipment damage to the railcars, Atlantic Mutual has paid Conrail $294,288.91 and Potapsco & Black River Railroad Co. $49,613.75. Atlantic Mutual has not paid any of the car hire charges that Cross Harbor incurred as a result of the incident. Conrail and Potapsco have asserted car hire claims against Cross Harbor in the amounts of $39,446.48 and $8,598.71, respectively.

The total of the unpaid cargo claims and the unpaid car hire claims is $353,433.53.

But Cross Harbor does not now seek that full amount because, if it were paid, the $1,000,000.00 limit of the policy would be exceeded. The parties have agreed that it would be wisest for the court first to decide the issue of Atlantic Mutual's liability under the policy. They have agreed to attempt to compute damages without the court's intervention, in the event the court finds for Cross Harbor.

The insurance policy provided:

The Assurer hereby undertakes to make good to the Assured or the Assured's executors, administrators and/or successors, all such loss and/or damage and/or expense as the Assured shall as owners of the vessel named herein have become liable to pay and shall pay on account of the liabilities, risks, events and/or happenings herein set forth....

This provision was qualified by various language, the relevant portions of which are reproduced in Appendix 1 to this memorandum and order. With the exception of clause 6, all of the language quoted in Appendix 1 was set forth in printed clauses that are standard to a so-called SP–23 Protection and Indemnity Policy. Clause 6 was typewritten and appeared under the heading "Special Conditions."

Among other things, clause 6 required Cross Harbor to file a copy of its Interstate Commerce Commission (ICC) tariff with Atlantic Mutual. An insurance broker forwarded the tariff copy to Atlantic Mutual with a cover letter dated July 30, 1984. Pertinent language from the ICC tariff is reproduced in Appendix 2.

Bethlehem Steel Corp. shipped 903 steel rails that were carried within eight of the railcars that were lost or damaged in the sinking of CARFLOAT 29. The rails were carried in railcars from Bethlehem Steel in Steelton, Pennsylvania for shipment to the New York City Transit Authority, which is served by the South Brooklyn Railroad. Bethlehem Steel contracted with Conrail for this shipment. In this connection, eight waybills were prepared. They identified,

among other things, the shipper, the consignee, the railcar number, and the description of the cargo. Conrail also prepared freight bills that contained information from the waybills but added the weight of the cargo and the freight rate Conrail was charging. Conrail issued the freight bills to Bethlehem Steel at or about the time the cargo left Steelton.

Conrail charged Bethlehem Steel $1.07 per one hundred pounds—abbreviated "c.w. t."—for the entire carriage from Steelton to Brooklyn, which included Cross Harbor's trip from New Jersey to Brooklyn. Cross Harbor agreed to accept $418.87 per railcar from Conrail for the New Jersey to Brooklyn trip. Cross Harbor intended to "interchange" the railcars to the South Brooklyn Railroad, see supra pp. 554–55, for delivery to the New York City Transit Authority. Cross Harbor negotiated its rate only with Conrail; Conrail used that rate to arrive at its rate of $1.07 c.w.t. for Bethlehem Steel.

When Conrail interchanged the railcars to Cross Harbor at Greenville Terminal, Conrail gave Cross Harbor an "interchange receipt" showing the railcar number and the time and place of the interchange. This is the only document exchanged between Conrail and Cross Harbor showing a delivery of the railcars from one to the other. Similarly, an interchange receipt would have been the only document exchanged at the time that Cross Harbor would have interchanged the cars with the South Brooklyn Railroad—a transaction that never took place in light of the sinking of CARFLOAT 29.

Dow Chemicals U.S.A. shipped a railcar of polyethylene damaged in the sinking of the vessel. The railcar was being carried from St. Louis, Missouri to Franklin Poly Products in Brooklyn, pursuant to a Conrail waybill and freight bill. Conrail charged Dow $3.26 c.w.t. for the move, or a total of $6,311.36. As with Bethlehem Steel's rails, Cross Harbor agreed to accept from Conrail $418.87 for moving Dow's

railcar from New Jersey to Brooklyn. Conrail used this figure to compute the rate of $3.26 c.w.t.

Boise Southern Plywood Company shipped a railcar of plywood lost in the sinking of CARFLOAT 29. The plywood was moving from Florien, Louisiana to Tampa Forest Products for delivery in Brooklyn. It moved pursuant to a Kansas City Southern Railway waybill, because it originated in Louisiana. After some transfers, the railcar of plywood was interchanged by Conrail to Cross Harbor in New Jersey. Conrail, which moved this railcar the furthest, issued the freight bill for it. The entire trip from Florien to Brooklyn cost $44,148.45, based on a rate of $3.22 c.w.t. for the first 100,000 pounds and $2.26 c.w.t. for the excess. Once again, Cross Harbor agreed to accept $418.87 for moving this railcar from New Jersey to Brooklyn. The other railroads involved in the plywood shipment received from Conrail a division of the total freight. Conrail considered all these charges in fixing the rate of $3.22 c.w.t. and $2.26 c.w.t.

Kohler Manufacturing shipped a container of plumbing supplies that was lost in the casualty. The container was to move from Kohler, Wisconsin to Todd Logistics in Brooklyn and was placed on a flatcar by Conrail. Cross Harbor agreed to accept $63.36 to move the flatcar from New Jersey to Brooklyn. This represented twelve percent of the total freight.

Roseburg Lumber Co. shipped a railcar of particleboard from Dillard, Oregon for ultimate delivery in Brooklyn, New York, pursuant to a waybill of the Southern Pacific Transportation Co. This railcar, which was lost in the sinking of the vessel, was interchanged once before Conrail interchanged it to Cross Harbor in New Jersey. Roseburg was charged $6,818.50 in freight for the entire move. Cross Harbor agreed with Conrail that it would receive $314.00 to move the railcar from New Jersey to Brooklyn. Southern Pacific and Conrail divided the total freight charge.

According to the shipping documents, none of the shipments in controversy was packaged. In addition to the lost shipments described above, each of the fifteen railcars aboard CARFLOAT 29 was damaged. Cross Harbor has settled the cost or replacement or repair, and Atlantic Mutual has paid these claims. But Conrail and Potapsco have assessed "car hire" charges against Cross Harbor in the amount of $48,045.19, *see supra* pp. 555–56, and Atlantic Mutual has declined to pay these claims. If a railcar is damaged or destroyed after being interchanged to a railroad, the railroad pays a car hire charge to the owner of the car. Car hire is a per diem charge based upon the value of the car and is fixed by the interchange agreement between the railroads. The Official Railway Equipment Register, Code of Car Hire Rules and Interpretations, provides that car hire charges run from the time of the casualty to the time the railroad either offers to settle for constructive total losses or, when the cost or repairs is less than the value of the car, when the railroad gets the car to the repair shop. In this instance, Cross Harbor was charged car hire from the date of the incident, November 14, 1984, until January 31, 1986, when the equipment claim settlement was approved and Conrail and Potapsco were so advised.

The action is within the court's admiralty jurisdiction. 28 U.S.C. § 1333(1); Fed.R. Civ.P. 9(h). Venue is proper. *See* 28 U.S.C. § 1391(b). For the reasons that follow, the court concludes that Atlantic Mutual is not liable to Cross Harbor for any more than the $3,500.00 offered before trial.

### I. *Clause 8(bb)*

■ Clause 8(bb) of the insurance policy, reprinted in Appendix 1, limits the liability of Atlantic Mutual to such as would exist if Cross Harbor's contract of carriage included a clause limiting its liability to $250 per package shipped or, for goods not shipped in packages, to $250 per "customary freight unit." If clause 8(bb) is given ef-

fect and interpreted as read by Atlantic Mutual, then Atlantic Mutual's liability will be limited to $3,500, i.e., $250 for each of the fourteen railcars in dispute. In this Part I, the court holds that clause 8(bb) should be given effect. In Part II, *infra*, the court holds that Atlantic Mutual's reading of clause 8(bb) is correct: the railcar is the customary freight unit.

### A. *Jason Clause Reference*

Clause 8(bb) begins:

> Liability hereunder shall be limited to such as would exist if the Charter Party, Bill of Lading or Contract of Affreightment contained the following clause (in substitution for the clause commonly known as the Jason Clause)....

Cross Harbor argues that its bill of lading, interchange receipt, and other contracts of carriage do not provide a Jason Clause. *See generally* G. Gilmore & C. Black, The Law of Admiralty 266–68 (2d ed. 1975) (discussing history and meaning of Jason Clause). As a consequence, according to Cross Harbor: "The obligation in the policy is only to *substitute* a clause for the Jason Clause, not to *add* certain clauses to Cross Harbor's contracts of carriage. Thus, no substitution is warranted under the policy and, by its own terms, the limitation of liability clause 8(bb) does not apply." Plaintiff's Memorandum of Law at 18 (June 9, 1987) (emphasis in original).

This argument lacks merit, because the sentence referring to the Jason Clause requires the substitution of only one clause, which is set forth in a single paragraph surrounded by quotation marks. The $250 limit on liability appears in a later paragraph that is not dependent upon the existence of a Jason Clause.

### B. *Effect of "Cargo Liability" Clause*

Alternatively, Cross Harbor seeks to avoid the effect of clause 8(bb) by relying upon a typewritten clause 6, entitled "Cargo Liability," which also is set forth in Appendix 1. Clause 6 provides that Atlantic Mutual's liability shall not exceed Cross Harbor's responsibility under its ICC tariff, *see* Appendix 2, in other words, $250,000.00 per shipment. Cross Harbor construes clause 6 as superseding clause 8(bb), but Atlantic Mutual demonstrates that the clauses may be read in harmony. Specifically, clause 6 sets a $250,000 cap on liability and protects Atlantic Mutual in a situation where the carfloat held so many packages or customary freight units that the total of $250 payments (pursuant to clause 8(bb)) would exceed $250,000. Because clause 6 is unambiguously consistent with clause 8(bb), the former does not supersede the latter, and Cross Harbor cannot utilize clause 6 to defeat the limitation on liability set forth in clause 8(bb).

### C. *Validity of Clause 8(bb)'s Limitation of Liability*

Cross Harbor's next alternative theory is that even if clause 8(bb) means what Atlantic Mutual says it means, it still may not be given effect. This is because it would have been impermissible for Cross Harbor to impose a $250 liability limit, inasmuch as Cross Harbor is a railroad governed by the Interstate Commerce Act (codified as amended in scattered section of 49 U.S.C.). Atlantic Mutual observes, however, that Cross Harbor *was* permitted to limit liability to $250, because the Interstate Commerce Act provides in relevant part:

> A rail carrier ... may establish rates for transportation of property under which the liability of the carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier, and may provide in such written declaration or agreement for specified amounts to be deducted from any claim against the carrier for loss or damage to the property or for delay in the transportation of such property.

49 U.S.C. § 10730(c).

While "a carrier cannot limit its liability automatically or by implication," a "written release by the shipper" makes "a carrier's limitation of liability ... effective." *CO-OPerative Shippers, Inc. v. Atchison, Topeka & Santa Fe Railway*, 613 F.Supp. 788, 794 (N.D.Ill.1985); *see generally Shippers National Freight Claim Council, Inc. v. ICC*, 712 F.2d 740, 743 (2d Cir.1983) (section 10730(c) permits rail carriers to establish "released rates" without ICC approval; released rate need not be "reasonable under the circumstances"), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984). Cross Harbor's reliance on *Puerto Rico Marine Management, Inc. v. Ken Penn Amusement, Inc.*, 574 F.Supp. 563 (W.D.Pa.1983), is misplaced. *Ken Penn* held that a limitation of liability could not be enforced in the absence of actual notice, *id.* at 567, but this states no limitation on Cross Harbor's ability to include in its bill of lading a provision giving notice to all that the $250 ceiling was in effect. Nor can Cross Harbor benefit from *Ken Penn*'s statement that "a contract cannot impose obligations upon one who is not a party to the contract," *id.* at 566. Cross Harbor maintains that any attempt to limit its liability would fail because of an absence of privity of contract between Cross Harbor and the cargo claimants. But it was not Atlantic Mutual's task to figure out a method for Cross Harbor to draft an effective limitation of liability, something that Cross Harbor could have arranged before taking any freight from Conrail (the only party with which Cross Harbor dealt).

For the foregoing reasons, the court holds that clause 8(bb) is enforceable. The next question is what the clause means.

## II. *Customary Freight Unit*

Clause 8(bb) limits liability to $250 per customary freight unit. While Cross Harbor does not concede that clause 8(bb) should apply, it argues in the alternative that the customary freight unit is one hundred pounds, because it computed its charges on that basis, also known as "c.w. t.," *see supra* pp. 555–56. For its part, Atlantic Mutual argues, persuasively in the view of the court, that the customary freight unit is per car.

Cross Harbor concedes that it has charged Conrail on a flat railcar basis since 1980. The insurance policy in question was in effect in 1984 and 1985, with the incident involving CARFLOAT 29 taking place in November 1984. There is not much force to plaintiff's argument that "[i]t [was] only for the sake of accounting simplicity that Cross Harbor charge[d] Conrail on a flat railcar basis," Plaintiff's Memorandum of Law at 34–35 (June 9, 1987). "In computing the customary freight unit in a particular case, a court must look to the unit which the carrier actually used to compute the freight charge for the shipment." *General Electric Co. v. M.V. "NEDLLOYD ROUEN"*, 618 F.Supp. 62, 65 n. 1 (S.D.N.Y.1985). "The words 'customary freight unit' ... refer not to the physical shipping unit but to the unit of cargo 'customarily used as the basis for the calculation of the freight rate to be charged.'" *Ulrich Ammann Building Equipment, Ltd. v. M/V MONSUN*, 609 F.Supp. 87, 89 (S.D.N.Y.1985). Here, Cross Harbor simply charged Conrail on a flat railcar basis. This is the best proof of what was meant by "customary freight unit," notwithstanding Cross Harbor's internal thought processes. Accordingly, the court finds that the customary freight unit was the railcar rather than one hundred pounds of cargo.

## III. *Car Hire*

The final element of Cross Harbor's claim is for $48,045.19 in car hire charges assessed by Conrail and Potapsco. *See supra* pp. 557–58. Cross Harbor emphasizes language in the policy, quoted *supra* p. 556, to the effect that Atlantic Mutual committed itself to cover any loss, damage, or expense caused by events such as the casualty to CARFLOAT 29. Atlantic Mutual has two answers to this contention: (1)

car hire charges are the product of a contract among railroads and are therefore outside the scope of the policy, which covers Cross Harbor's liability only as owner of the vessel; (2) in any event, car hire is equivalent to lost freight hire or demurrage, both of which are excluded from coverage by a provision of the policy reprinted in the last paragraph on page A1, *infra.* For the reasons that follow, the court agrees with both of Atlantic Mutual's responses.

## A. *Scope of the Policy*

Cross Harbor's obligation to pay car hire charges stems from interchange agreements it reached with other railroads. Cross Harbor reached these agreements with railroads in its role as a railroad. The disputed insurance policy, however, makes frequent references to Cross Harbor as owner of a vessel. "[P]rotection and indemnity policies do not purport to cover all types of an insured's liability but extend only to the liabilities specifically enumerated in the insuring agreement." *St. Paul Fire & Marine Insurance Co. v. Vest Transportation Co.,* 500 F.Supp. 1365, 1373 (N.D.Miss.1980), *aff'd per curiam on opinion below,* 666 F.2d 932 (5th Cir.1982). As in *St. Paul,* the insurance policy under consideration here is a standard form SP–23. *St. Paul* observed:

Settled case law supports the limited contours of liability coverage arising from marine insurance policies which clearly emphasize, as does SP–23, that indemnification extends to the assured only "as owner of the vessel named herein" for a cost or expense of "removal of the wreck of the vessel named herein" and states, "each vessel deemed a separate insurance." *These explicit policy provisions leave no room for doubt or ambiguity as to who is the insured, in what capacity he is insured, and for which losses he will be indemnified.* It would therefore be improper to construe these policy provisions in favor of an assured's position under the rubric of affording him the benefit of resolving doubtful coverage against the insurer.

*Id.* at 1374 (emphasis added).

The court added:

The consensus of the federal cases, unanimous so far as our research reveals, is that in P & I [protection and indemnity] protection afforded by underwriters under terms or language similar to SP–23 the assured must be liable as owner of the insured vessel; liability in any other capacity is irrelevant. . . .

*Id.* at 1375; *accord Graham v. Milky Way Barge, Inc.,* 811 F.2d 881, 889 (5th Cir. 1987) (vessel operating beyond navigational and operational limits of insurance policies was not covered at time of accident); *Wedlock v. Gulf Mississippi Marine Corp.,* 554 F.2d 240, 244 (5th Cir.1977) (barge owner not entitled to coverage because it paid its portion of settlement in role as barge owner, not as additional insured on a covered vessel); *Dow Chemical Co. v. Tug THOMAS ALLEN,* 349 F.Supp. 1354, 1364–65 (E.D.La.1972) (same).

■ Because Cross Harbor's car hire obligations are the product of its activities as a railroad, these obligations fall outside the scope of the standard protection and indemnity policy that Cross Harbor obtained in its role as owner of a vessel. If Cross Harbor had wanted coverage for car hire charges, it would have had to obtain a different policy that covered car hire. Certainly, exclusion of car hire from the SP–23 policy does not render the policy absurd, because Cross Harbor did recover more than $700,000 for the sinking of CARFLOAT 29. The SP–23 protection and indemnity policy covered many liabilities, but car hire was not among them.

## B. *Demurrage*

Atlantic Mutual's alternative argument with respect to car hire also has merit. It is not disputed that the policy excluded coverage for "demurrage," but the parties cannot agree on whether the term includes

car hire charges. The court accepts Atlantic Mutual's construction of demmurage: it includes car hire charges.

The Second Circuit reviewed the meaning of "demurrage" nearly fifteen years ago:

> As the Supreme Court said in *The Apollon*, 22 U.S. (9 Wheat.) 362, 378 [6 L.Ed. 111] (1824), "demurrage is merely an allowance or compensation for the delay or detention of a vessel". *Accord, Continental Grain Co. v. Armour Fertilizer Works*, 22 F.Supp. 49, 54 (S.D.N.Y.1938). Thus, the most logical interpretation of the "no demurrage" clause is that it precludes liability for detention damages.

*Hellenic Lines, Ltd. v. Embassy of Pakistan*, 467 F.2d 1150, 1156 (2d Cir.1972).

■ Stated otherwise, demurrage is to the world of shipping what car hire is to the world of railroads: compensation for delay. Thus, even if Cross Harbor were able to show that it was operating a vessel, rather than a railroad, when CARFLOAT 29 sank, the car hire charges still would not be covered. In effect, the policy says that Atlantic Mutual will not cover Cross Harbor for liabilities arising from delay. The meaning is clear, whatever name is attached to Cross Harbor's obligation to Conrail and Potapsco.

## IV. *Conclusion*

The foregoing constitutes the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a). In its briefs, Atlantic Mutual has taken the position that Cross Harbor was entitled to no more than the offer of $3,500.00. Had there been a formal offer of judgment to that effect, Atlantic Mutual would be entitled to "costs incurred after the making of the offer," Fed.R.Civ.P. 68. It appears, however, that a formal rule 68 order was not made. Technically, therefore, Cross Harbor is a "prevailing party" and generally would be entitled to costs. Fed.R.Civ.P. 54(d). Rule 54(d) provides that prevailing party is entitled to costs "unless the court otherwise directs." Because Cross Harbor will recover no more than Atlantic Mutual offered, it would be inappropriate for Cross Harbor to receive costs. Therefore, the clerk shall enter judgment in favor of Cross Harbor in the sum of $3,500.00, with no costs to either side.

SO ORDERED.

# APPENDIX 1

And provided further that

, (aa) Liability hereunder shall in no event exceed that which would be imposed by law in the absence of contract.
(bb) Liability hereunder shall be limited to such as would exist if the Charter Party, Bill of Lading or Contract of Affreightment contained the following clause (in substitution for the clause commonly known as the Jason Clause):

"In the event of accident, danger, damage or disaster before or after commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the shipowner is not responsible, by statute or contract or otherwise, the shippers, consignees or owners of the cargo shall contribute with the shipowner in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo."

When cargo is carried by the vessel named herein under a bill of lading or similar document of title subject or made subject to the Carriage of Goods by Sea Act, April 16, 1936, liability hereunder shall be limited to such as is imposed by said Act, and if the Assured or the vessel named herein assumes any greater liability or obligation than the minimum liabilities and obligations imposed by said Act, such greater liability or obligation shall not be covered hereunder.

When cargo is carried by the vessel named herein under a charter party, bill of lading or contract of affreightment not subject or made subject to the Carriage of Goods by Sea Act, April 16, 1936, liability hereunder shall be limited to such as would exist if said charter party, bill of lading, or contract of affreightment contained the following clauses: a clause limiting the Assured's liability for total loss or damage to goods shipped to Two Hundred and Fifty ($250) Dollars per package, or in case of goods not shipped in packages, per customary freight unit, and providing for pro rata adjustment on such basis for partial loss or damage; a clause exempting the Assured and the vessel named herein from liability for losses arising from unseaworthiness, even though existing at the beginning of the voyage, provided that due diligence shall have been exercised to make the vessel seaworthy and properly manned, equipped, and supplied; a clause providing that the carrier shall not be liable for claims in respect of cargo unless notice of claim is given within the time limited in such Bill of Lading and suit is brought thereon within the limited time prescribed therein; and such other protective clauses as are commonly in use in the particular trade; provided the incorporation of such clauses is not contrary to law.

The foregoing provisions as to the contents of the Bill of Lading and the limitation of the Assurer's liability may, however, be waived or altered by the Assurers on terms agreed, in writing.

\* \* \*

It is expressly understood and agreed if and when the Assured under this policy has any interest other than as a shipowner in the vessel or vessels named herein, in no event shall the Assurer be liable hereunder to any greater extent than if such Assured were the owner and were entitled to all the rights of limitation to which a shipowner is entitled.

\* \* \*

Notwithstanding anything to the contrary contained in this policy, no liability attaches to the Assurer:

For any loss, damage, or expense which would be payable under the terms of the American Institute Hull Clauses (June 2, 1977) form of policy on hull and machinery, etc., if the vessel were fully covered by such Hull insurance sufficient in amount to pay such loss, damage, or expense.

For any loss, damage or expense sustained by reason of capture, seizure, arrest, restraint or detainment, or the consequence thereof or of any attempt thereat; or sustained in consequence of military, naval or air action by force of arms, including mines and torpedoes or other missiles or engines of war, whether of enemy or friendly origin; or sustained in consequence of placing the vessel in jeopardy as an act or measure of war taken in the actual process of a military engagement, including embarking or disembarking troops or material of war in the immediate zone of such engagement; and any such loss, damage and expense shall be excluded from this policy without regard to whether the Assured's liability therefor is based on negligence or otherwise, and whether before or after a declaration of war.

For any loss, damage, or expense arising from the cancellation or breach of any charter, bad debts, fraud of agents, insolvency, loss of freight hire or demurrage, or as a result of the breach of any undertaking to load any cargo, or in respect of the vessel named herein engaging in any unlawful trade or performing any unlawful act, with the knowledge of the Assured.

\* \* \*

6. Cargo Liability

Any liability covered hereunder related to loss or damage to cargo for which the Assured may be legally liable shall not exceed the Assured's responsibility under the Assured's published tariff on file with Underwriter's unless said responsibility is increased by law. However, in no event shall these Assurers liability exceed the limit of liability provided under this policy as respects any one occurrence.

## APPENDIX 2

| ITEM | SPECIAL RULES AND REGULATIONS - UNLIMITED | |
|---|---|---|

\* \* \*

**350**     **LIABILITY - RELEASED**

Any shipment tendered from, to, or via NYCH requiring carfloat service shall be subject to maximum carrier liability of $250,000.00 per shipment. Shipper is required to place the following notation on the Bill of Lading:

"SHIPPER AGREES AND DECLARES THAT THE VALUE OF THE PROPERTY IS RELEASED TO AN AMOUNT NOT EXCEEDING $250,000.00 PER SHIPMENT FOR CARFLOAT SERVICE VIA NYCH".

At the shipper's option, NYCH will secure additional coverage beyond the limits stated herein. Any additional insurance costs will be for account of shipper.

If the shipper secures its own insurance beyond the limits stated herein, NYCH is to be named as an additional insured and certification to that effect supplied to NYCH.

\* \* \*

**SECTION 1**
**SPECIFIC COMMODITY RATES**

Rates in this Section will apply REGARDLESS of rates published in any other section of tariff from and to the same points, via the same route.

| ITEM | COMMODITY | BETWEEN (Except as Noted) | AND (Except as Noted) | RATE | PER | MINIMUM WEIGHT (In Pounds) |
|---|---|---|---|---|---|---|
| | | | | | | |

\* \* \*

| ITEM | COMMODITY | BETWEEN (Except as Noted) | AND (Except as Noted) | RATE | PER | MINIMUM WEIGHT (In Pounds) |
|---|---|---|---|---|---|---|
| ♦ 1400 | LUMBER AND PLYWOOD (Proportional. Applicable only on traffic originating within TransContinental Territory) | Direct Connections (shown in Item 300) | NYCH Terminals (shown in Item 270) | $300.00 | CAR | (AQ) |