## NEW YORK CROSS HARBOR RAILROAD TERMINAL CORP., Appellant,

v.

## ATLANTIC MUTUAL INSURANCE CO., Appellee.

No. 620, Docket 87–7773.

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1988.

Decided June 14, 1988.

Thomas L. Tisdale, New York City (Dougherty, Ryan, Mahoney, Pellegrino,

Giuffra & Zambito, Peter J. Zambito, New York City, of counsel), for appellant.

John T. Kochendorfer, New York City (Bigham, Englar, Jones & Houston, Donald T. Rave, Jr., New York City, of counsel), for appellee.

Before OAKES, NEWMAN and MINER, Circuit Judges.

OAKES, Circuit Judge:

This case involves the liability of an insurer on a marine protection and indemnity insurance policy covering a barge fitted for the carriage of railcars where, under federal law, the insured is deemed a "railroad" governed by the Interstate Commerce Commission ("ICC"). In November 1984 the unfortunate barge sank alongside Pier 1 at the Brooklyn Army Terminal with fifteen cargo-filled railcars on it.

The case presents a potential conflict between limitation of liability language derived from the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. §§ 1300–15 (Supp. III 1985), contained in the form marine insurance policy issued, and statutory provisions that prohibit a rail carrier from limiting liability to a shipper except by an agreement accompanied by a correspondingly lower freight rate, 49 U.S.C. §§ 10730(c), 11707(c)(1) (1982). In addition, we confront the more specific problem of resolving a conflict between two internally inconsistent limitation of liability provisions in the policy. The United States District Court for the Eastern District of New York, I. Leo Glasser, Judge, after a trial on stipulated facts, held for the insurer, Atlantic Mutual Insurance Co. ("Atlantic Mutual"), on the claim of the barge operator, New York Cross Harbor Railroad Terminal Corp. ("Cross Harbor"), for $305,388.34, the full amount of unpaid settlements with shippers who lost cargo in the submerged railcars. The court limited recovery instead to $250 per railcar lost or $3,500 and also held that "car-hire" charges assessed against the barge owner in the sum of $48,045.19 are not covered by the policy. 669 F.Supp. 554.

## FACTS

Cross Harbor operates a fleet of "carfloats," that is, barges fitted for the carriage of railcars, between terminals in Jersey City, New Jersey, and Brooklyn, New York. As such, Cross Harbor is considered a railroad and is subject to ICC regulation. 49 U.S.C.A. § 10102(21)(A) (West Supp. 1988). In industry parlance, Cross Harbor operates a "short-line" railroad which connects with "trunk-line" railroads, primarily Conrail, carrying railcars for Conrail across the upper New York Bay. Cross Harbor has no direct dealings with any of the shippers or consignees of the cargo carried aboard these railcars but merely receives a division of the freight rate charged by Conrail. Prior to the adoption of the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (codified as amended in scattered sections of U.S.C. Titles 11, 45, and 49), Cross Harbor's predecessor had a contract with Conrail charging freight for all commodities at a rate per 100 pounds ("cwt."). The Staggers Rail Act, however, permitted Cross Harbor to compute its freight rate on a per-car basis in determining its proportional share of the overall transportation charges. An affidavit of Cross Harbor's president states that the company adopted this method of computing charges "[f]or the sake of accounting simplicity." Atlantic Mutual, however, contends that this per-car negotiation is a controlling fact.

In August 1984, Atlantic Mutual issued a policy insuring Cross Harbor for damage to cargo carried aboard its carfloats. The policy premiums were $61,000, with a $15,000 deductible for each occurrence. The policy is in part a preprinted standard marine insurance form typically used to insure carfloat operators. The policy also contains, however, a typewritten section entitled "Special Conditions" with nine particularized provisions.

While the policy was in effect, Cross Harbor's Carfloat 29, laden with fifteen railcars that it had received from—or, technically speaking, "interchanged" with—Conrail, sank in upper New York Bay causing loss or damage to all the railcars and

the cargo in each. At the insistence of Atlantic Mutual, and in order not to jeopardize its insurance coverage, Cross Harbor commenced a limitation of liability action under 46 U.S.C. app. § 183 (Supp. III 1985). Claims for damage to the cargo and railcars, as well as claims for car-hire charges, totaling approximately $1 million were filed in the limitation action by the owners or beneficial owners of the property involved in the casualty. Settlement was made with all claimants, pursuant to which one claimant, Cargill, Inc., was to receive $90,582.51 for cargo damage. Atlantic Mutual paid Cargill's claim, along with Conrail's claim of $343,902.16 for loss of the railcars in full. As to the other six claimants for cargo damage, whose settled claims total $305,388.34,[1] Atlantic Mutual denied liability except on an extremely limited basis. Atlantic Mutual did, however, pay more than $200,000 to remove the sunken vessel and its cargo, as well as legal fees and expenses incurred in the limitation of liability action, the payments falling in part under Cross Harbor's hull policy with Atlantic Mutual, and in part under the subject protection and indemnity policy.

The provision in the insurance policy principally relied upon by Atlantic Mutual to limit its liability is Clause 8(bb), set forth in the margin.[2] In brief, the provision limits the insurer's liability, unless provided otherwise in writing or unless such a limitation would be contrary to law, to such as would exist if the insured's bill of lading limited liability for cargo damage to $250 per package or, for goods not shipped in packages, per customary freight unit. In addition, Clause 6 of the typewritten "Special Conditions" rider to the policy specifically covers "cargo liability" and reads as follows:

> Any liability covered hereunder related to loss or damage to cargo for which the Assured may be legally liable shall not exceed the Assured's responsibility under the Assured's published tariff on file with Underwriter's [sic] unless said responsibility is increased by law. However, in no event shall these Assurers [sic] liability exceed the limitation of liability provided under this policy as respects any one occurrence.

The limitations of liability referred to are a $250,000 per shipment limit in Cross Harbor's tariff and the $1 million limit of the policy. Significantly, Cross Harbor, via its insurance broker, did forward to Atlantic Mutual, as required by Clause 6, copies of its ICC tariff. Pertinent portions thereof

---

1.

| | |
|---|---:|
| Bethlehem Steel | $213,737.16 |
| Dow Chemical | 36,300.00 |
| Roseburg Lumber | 14,372.04 |
| Kohler Manufacturing | 13,586.07 |
| Tampa International Forest Products | 19,869.07 |
| Corn Products | 7,524.00 |
| | $305,388.34 |

2. 8(bb). Liability hereunder shall be limited to such as would exist if the Charter Party, Bill of Lading or Contract of Affreightment contained the following clause (in substitution for the clause commonly known as the Jason Clause):
. . . .
When cargo is carried by the vessel named herein under a charter party, bill of lading or contract of affreightment not subject or made subject to the Carriage of Goods by Sea Act, April 16, 1936, liability hereunder shall be limited to such as would exist if said charter party, bill of lading, or contract of affreightment contained the following clauses: a clause limiting the Assured's liability for total

loss or damage to goods shipped to Two Hundred and Fifty ($250) Dollars per package, or in case of goods not shipped in packages, per customary freight unit, and providing for pro rata adjustment on such basis for partial loss or damage; a clause exempting the Assured and the vessel named herein from liability for losses arising from unseaworthiness, even though existing at the beginning of the voyage, provided that due diligence shall have been exercised to make the vessel seaworthy and properly manned, equipped, and supplied; a clause providing that the carrier shall not be liable for claims in respect of cargo unless notice of claim is given within the time limited in such Bill of Lading and suit is brought thereon within the limited time prescribed therein; and such other protective clauses as are commonly in use in the particular trade; provided the incorporation of such clauses is not contrary to law.
The foregoing provisions as to the contents of the Bill of Lading and the limitation of the Assurer's liability may, however, be waived or altered by the Assurers on terms agreed, in writing.

are set forth in the margin.[3]

Cross Harbor issued no bills of lading to any of the shippers whose claims are involved here. Rather, it was Conrail that issued waybills identifying the shipper, consignee, and railcar number and describing the cargo. Conrail also prepared freight bills containing the same information as the waybills but adding Conrail's freight charges based upon the weight of the cargo. Figured into the rate quoted to shippers was an amount negotiated between Conrail and Cross Harbor for the "interchange" of railcars. When the railcars were loaded on the carfloat, Conrail gave Cross Harbor an "interchange receipt" showing only the railcar number and the time and place of the interchange. Cross Harbor does not and never has issued maritime bills of lading. Nor has it ever moved cargo pursuant to a bill of lading containing a "Jason Clause," the common name for a limitation of liability clause now standard in all bills covering carriage under COGSA. *See, e.g.,* note 2 *supra; see generally* G. Gilmore & C. Black, *The Law of Admiralty* 266–68 (2d ed. 1975) (discussing history and meaning of Jason Clause).

Reviewing the disputed cargo claims, we observe that Conrail charged Bethelehem Steel Corp. $1.07 per 100 pounds (cwt.) for the entire carriage from Steelton, Pennsylvania, to Brooklyn, New York, of 903 steel rails lost or damaged in eight railcars that sank on Carfloat 29. That rate included $418.87 per railcar for Cross Harbor's portion of the trip. Dow Chemicals U.S.A., another cargo claimant, shipped a single railcar of polyethylene from St. Louis, Missouri, to Brooklyn, for which Conrail charged it $3.26 cwt., or a total of $6,311.36, with Cross Harbor agreeing to accept $418.87 from Conrail for its segment of the carriage. For transporting a railcar filled with plywood from Boise Southern Plywood Co., Conrail and other railroads divided freight charges of $4,148.45 based upon cwt. rates. Cross Harbor accepted $418.87 for its interchange, a fee negotiated in advance with Conrail. Cross Harbor also carried a container of plumbing supplies from Kohler Manufacturing for $63.36, or 12% of the total freight charges, and a railcar of particleboard shipped by Roseburg Lumber Co. for $314 out of total freight charges of $6,818.50.[4]

As for car-hire charges, if a railcar is damaged or destroyed after being interchanged to a railroad, the railroad pays a per diem charge to the owner of the car for loss of its use. The amount of the charge is fixed by the interchange agreement among the railroads. The Official Railway Equipment Register, Code of Car-hire

---

3. ITEM 340   SPECIAL RULES AND REGULATIONS—UNLIMITED LIABILITY—LIMITED

Shipper or consignee or their agents shall be responsible for, and release, indemnify and hold harmless NYCH from any and all liability, including loss or damage to NYCH float, cars, equipment, and cargoes loaded therein, resulting from any acts or omissions of shipper or consignee or their agents during the time said float, cars, equipment and cargoes are in the possession of, or are being handled between terminals on this line and connecting points by, shipper or consignee or their agents. *Insurance shall also be maintained covering the above obligations in such amount as required by NYCH, and NYCH shall be named as an additional insured in the insurance policies.*

350   LIABILITY—RELEASED

Any shipment tendered from, to, or via NYCH requiring carfloat service shall be subject to maximum carrier liability of $250,000.00 per shipment. Shipper is required to place the following notation on the Bill of Lading:

"SHIPPER AGREES AND DECLARES THAT THE VALUE OF THE PROPERTY IS RELEASED TO AN AMOUNT NOT EXCEEDING $250,000.00 PER SHIPMENT FOR CARFLOAT SERVICE VIA NYCH".

At the shipper's option, NYCH will secure additional coverage beyond the limits stated herein. Any additional insurance costs will be for account of shipper.

If the shipper secures its own insurance beyond the limits stated herein, NYCH is to be named as an additional insured and certification to that effect supplied to NYCH.

. . . .

4. Atlantic Mutual did not assert limitation as to the Cargill shipment, but paid the settled amount of $90,582.51. Atlantic Mutual contends that "on that particular cargo . . . the unit of limitation did not reduce the claim" [Appellee's Br. 4], while Cross Harbor suggests that the only factor distinguishing the Cargill claim from the cargo claims not paid is "the manner in which Conrail and Cross Harbor divided the freight between them." [Appellant's Br. 4.]

Rules and Interpretations, provides that car-hire charges run from the time of the casualty to the time the railroad either offers to settle for constructive total losses or, if the cost of repairs is less than the value of the car, when the railroad gets the car to the repair shop. In this case, Cross Harbor was charged car-hire totaling $48,-045.19 from the date of the incident, November 14, 1984, until January 31, 1986, when the equipment claim settlement was approved.

## THE DISTRICT COURT DECISION

The district court, in a memorandum and order reported at 669 F.Supp. 554 (E.D.N.Y.1987), held that Clause 8(bb) expressly limits the liability of Atlantic Mutual to such as would exist if Cross Harbor's contract of carriage with each shipper had included a clause limiting its liability to $250 per package shipped or, for goods not shipped in packages, to $250 per customary freight unit. The court first rejected the argument that, because none of Cross Harbor's contracts of carriage contains a Jason Clause, Clause 8(bb) is irrelevant. The district court concluded that in contracts of carriage not governed by COGSA, the policy's requirement that the insured insert a paragraph limiting liability to $250 per unit is a requirement to *add*, rather than to substitute a provision, and is therefore not dependent upon the existence of a Jason Clause. 669 F.Supp. at 558.

The court then rejected Cross Harbor's argument that Clause 6, the "cargo liability" rider in the Special Conditions, was drafted to conform coverage under the policy to Cross Harbor's liability for cargo loss and damage under its ICC tariff, and, because Clause 8(bb) expressly permits modification or waiver of its terms, therefore supersedes Clause 8(bb). In the district court's opinion, Clause 6 merely sets a cap on liability equal to Cross Harbor's maximum legal liability to protect Atlantic Mutual in the event any shipment comprises so many packages or customary freight units that the total number of $250 payments under Clause 8(bb) exceeds Cross Harbor's maximum liability of $250,000. *Id.*

The court also rejected Cross Harbor's argument that under the Interstate Commerce Act (codified as amended in scattered sections of 49 U.S.C.), it could not lawfully impose a $250 limit on cargo shippers. *Id.* at 558–59. The court noted that 49 U.S.C. § 10730(c) permits Cross Harbor, by written agreement with the shipper, to limit liability to any amount and that such a limitation could be enforceable if Cross Harbor included "in its bill of lading a provision giving [actual] notice to all that the $250 ceiling was in effect." *Id.* at 559. The court acknowledged the difficulty Cross Harbor would have faced had it tried to enforce such a limitation against shippers with whom it did not contract, but concluded that difficulty—as opposed to illegality—could not relieve Cross Harbor of its obligation to draft an effective limitation of liability. *Id.*

Having concluded that Clause 8(bb) limits Atlantic Mutual's liability to $250 per customary freight unit, the court next determined that, as to the remaining unpaid claims, the "customary freight unit" was the railcar. *Id.* The court rejected Cross Harbor's argument that, because charges to shippers were computed on a cwt. basis, the customary freight unit was 100 pounds, finding conclusive Cross Harbor's concession that since the enactment of the Staggers Rail Act in 1980 its charges to Conrail had been figured on a flat railcar basis. The court dismissed Cross Harbor's president's explanation of "accounting simplicity," citing two COGSA cases, *General Electric Co. v. M.V. "Nedlloyd Rouen"*, 618 F.Supp. 62, 65 n. 1 (S.D.N.Y.1985), and *Ulrich Ammann Building Equipment Ltd. v. M/V Monsun*, 609 F.Supp. 87, 89 (S.D.N.Y.1985), for the proposition that in determining the customary freight unit, the unit which the carrier actually or customarily used to compute the freight charge for the shipment was dispositive.

Addressing the car-hire charges, the court held that because Cross Harbor incurred liability for such costs pursuant to interchange agreements with other rail-

roads, Cross Harbor's car-hire obligations were the product of its activities as a railroad, and, therefore, "fall outside the scope of the standard protection and indemnity policy that Cross Harbor obtained in its role as owner of a vessel." 669 F.Supp. at 560. Citing *St. Paul Fire & Marine Insurance Co. v. Vest Transportation Co.,* 500 F.Supp. 1365, 1373–75 (N.D.Miss.1980), *aff'd per curiam on opinion below,* 666 F.2d 932 (5th Cir.1982), and other cases for the proposition that indemnification in a standard marine insurance policy extends, within the explicit policy provisions, to the assured only as owner of the vessel, the court concluded that this required exclusion of all expenses not incurred by Cross Harbor in its marine capacity.

The court entered judgment in favor of Cross Harbor in the sum of $3,500, with no costs to either side.

## DISCUSSION

The fundamental difficulty with the district court's opinion is its treatment of Cross Harbor as simply a barge owner with a standard marine protection and indemnity policy covering cargo losses to its shippers. But Cross Harbor was not simply a vessel owner. As its name announces, Cross Harbor was also a railroad, regulated by the ICC, facts well known to Atlantic Mutual when it issued the policy.

▉ By failing fully to recognize the hybrid nature not only of Cross Harbor but of the insurance policy itself, the district court was led to error. In holding that the customary freight unit here is the railcar rather than the 100 pounds of cargo or cwt. which Conrail used as the basis of its charge to the shippers, the court missed two significant points made in the *Ulrich Ammann* case it cited. First, while customary freight unit is defined in marine cases as "the unit of cargo 'customarily used as the basis for the calculation of the freight rate to be charged,'" 609 F.Supp. at 89 (quoting *General Motors Corp. v. Moore–McCormack Lines, Inc.,* 451 F.2d 24, 25 (2d Cir.1971) (per curiam) (quoting *Brazil Oiticica Ltd. v. The Bill,* 55 F.Supp. 780, 783 (D.Md.1944))), the relevant unit refers to how the *shipper* is charged, not to how two interchanging carriers divide that charge between themselves. Here, the shippers were charged a single fee for the entire carriage, based on each 100 pounds of cargo, even though Conrail and Cross Harbor calculated Cross Harbor's share of that freight charge on a per railcar basis. Second, while adopting a definition of "customary freight unit" taken from COGSA cases, the court failed to consider COGSA's purpose. The court in *Ulrich Ammann* emphasized that "the 'guiding policy' of COGSA is 'to limit liability of common carriers for damaged [*sic*] cargo where the value of the cargo is not known to the carrier.'" *Id.* (quoting *General Motors Corp.,* 451 F.2d at 26). Were this strictly a marine case, the cargo claimants would be entitled to recovery per cwt. since they paid freight on that basis. Interpreting the "customary freight unit" to be the railcar, then, leads to a result exactly contrary to that intended by COGSA; it does not limit the carrier Cross Harbor's liability but only its indemnity.

▉ More importantly, however, the district court erred in applying the boilerplate terms of Clause 8(bb) to this case at all. To reiterate, Cross Harbor is a "railroad," under ICC regulations. As expressed in 49 U.S.C. § 11707(c)(1), the policy governing a railroad's liability is the converse of that in COGSA, i.e., the carrier bears 100% liability for damage or loss of cargo unless limited by an agreement with the shipper and accompanied by a correspondingly lower freight rate pursuant to 49 U.S.C. § 10730(c). *See New York, N.H. & H.R.R. v. Nothnagle,* 346 U.S. 128, 131–35, 73 S.Ct. 986, 988–90, 97 L.Ed. 1500 (1953). Since a rail carrier "may not charge or receive a different compensation for ... transportation or service than the rate specified in the tariff," 49 U.S.C.A. § 10761(a) (West Supp. 1988), the carrier's tariff, filed with the ICC, is central to our analysis of the carrier's attempts to limit liability under the statutory scheme. While "greater clarification" might be desirable as to what sort of notice, whether constructive or actual, of any limitations on liability shown in a carri-

er's filed tariff is sufficient to bind a *shipper* to its terms, *Mechanical Technology Inc. v. Ryder Truck Lines, Inc.*, 776 F.2d 1085, 1089 (2d Cir.1985) (Winter, J., concurring), as between the carrier and its *insurer*, the analysis is clear. The commercial reality is that "[c]arriers file tariffs containing limitations of liability geared to various freight rates, and insure themselves accordingly." *Id.*

We find that this particular policy was custom-tailored by Atlantic Mutual to meet Cross Harbor's special needs as a marine railroad. Clause 6 of the policy's Special Conditions rider states that the liability of the assurer to the assured "shall not exceed the Assured's responsibility under the Assured's published tariff on file with Underwriter's [*sic*] unless said responsibility is increased by law." A copy of the tariff was indeed forwarded to Atlantic Mutual by Cross Harbor's insurance broker. The accompanying cover letter specifically called Atlantic Mutual's attention to Item No. 350 in the tariff, the provision notifying shippers that any cargo tendered from, to, or via Cross Harbor requiring carfloat service "shall be subject to maximum carrier liability of $250,000.00 per shipment." Since Cross Harbor's tariff contains no other language limiting its liability to $250 per package or customary freight unit, we conclude that only Clause 6 limits Atlantic Mutual's obligation under the policy, and that it supersedes the boilerplate language of Clause 8(bb).

At the very least, the addition of the rider makes the policy ambiguous. Since ambiguity is, under New York law, to be construed liberally in favor of the insured, *see Francis v. INA Life Ins. Co.*, 809 F.2d 183, 185 (2d Cir.1987) (citing *Vargas v. Insurance Co. of North America*, 651 F.2d 838, 839–40 (2d Cir.1981)), we reach the same conclusion. "The insurer is 'obliged to show (1) that it would be unreasonable for the average man reading the policy to [construe it as the insured does] and (2) that its own construction was the only one that fairly could be placed on the policy.' " *Vargas*, 651 F.2d at 840 (quoting *Sincoff v. Liberty Mut. Fire Ins. Co.*, 11 N.Y.2d 386, 390, 230 N.Y.S.2d 13, 16, 183 N.E.2d 899,

901 (1962)). Cross Harbor's reading of the policy is both a fair construction and a reasonable one. And, as in *Vargas*, 651 F.2d at 841, "[i]n fact, it is appellee's [Atlantic Mutual's] construction that appears unreasonable in terms of [industry] practice." When coupled with the district court's finding that each customary freight unit was a railcar, the $250,000 cap would come into effect only when the carfloat carried 1,000 railcars, a bizarre prospect. Because each carfloat holds only fifteen railcars, Atlantic Mutual's construction renders meaningless the $250,000 limitation.

■ As to Cross Harbor's appeal concerning car-hire charges, the policy specifically provides coverage for "such loss and/or damage and/or expense as the Assured shall as owners of the vessel have become liable to pay...." Judge Glasser excluded the car-hire charges because the policy refers to coverage of Cross Harbor's liabilities "as owners of the vessel," and *not* as operators of a railroad. The cases on which the district court relies to exclude Cross Harbor's claims, however, are inapposite. The liability Cross Harbor faces unquestionably is derived from its capacity as owner of Carfloat 29, although when the brave ship went down, Cross Harbor was also wearing its engineer's cap. None of the cases cited by appellee or the district court deals with the owner of a single vessel performing a hybrid role of which the insurer was aware. *See* 669 F.Supp. at 560 (citing *Graham v. Milky Way Barge, Inc.*, 811 F.2d 881 (5th Cir.), *superseded on rehearing*, 824 F.2d 376 (5th Cir.1987); *Wedlock v. Gulf Miss. Marine Corp.*, 554 F.2d 240 (5th Cir.1977); *St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co.*, 500 F.Supp. 1365 (N.D.Miss.1980); and *Dow Chem. Co. v. Tug Thomas Allen*, 349 F.Supp. 1354 (E.D.La.1972)). Therefore, the district court erred in not analyzing the policy as a unique one covering Cross Harbor in its hybrid role as a marine railroad.

As an alternative basis for excluding the car-hire charges from coverage, the court analogized these costs to "demurrage," that is, compensation paid to the owner of a vessel by a charterer who does not return

the vessel on time. Therefore, the court reasoned, even if Cross Harbor could show it was operating a vessel rather than a railroad when Carfloat 29 sank, the policy expressly excluded these charges. Cross Harbor argues persuasively, however, that the policy's exclusion of liability for "loss of freight hire or demurrage" pertains to the *assured's*, i.e., Cross Harbor's, lost revenues, and not to consequential damages incurred as a result of the accident.

Judgment reversed and cause remanded for assessment of damages.